### GUTHRIE v. UNITED STATES.
### No. 11560.

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 20, 1953.

Decided June 25, 1953.

Petition for Rehearing Denied July 30, 1953.

Mr. James J. Laughlin, Washington, D. C., with whom Mr. Albert J. Ahern, Jr., Washington, D. C., was on the brief, for appellant.

Mr. William E. Kirk, Jr., Asst. U. S. Atty., Washington, D. C., at the time of argument, with whom Messrs. Charles M. Irelan, U. S. Atty., Washington, D. C., at the time of argument, Emory W. Reisinger, II, and William R. Glendon, Asst. U. S. Attys., Washington, D. C., at the time of argument, were on the brief, for appellee. Mr. Joseph M. Howard, Asst. U. S. Atty., Washington, D. C., at the time the record was filed, also entered his appearance for appellee. Mr. Leo A. Rover, U. S. Atty., Washington, D. C., also entered an appearance for appellee.

Before EDGERTON, WILBUR K. MILLER and WASHINGTON, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

On Friday, November 30, 1951, in Harry Guthrie's room on the third floor of a rooming house in the District of Columbia, Ruth Leong was brutally assaulted and a soft drink bottle [1] was introduced into her body. About midnight she was taken by the police to a hospital, where the bottle was removed, but she died December 12, 1951, from general peritonitis resulting from a perforated intestine.

Guthrie was indicted for second degree murder, found guilty by a jury, and sentenced to imprisonment for twenty years, with a recommendation by the trial judge that he be committed to an institution where he could have psychiatric treatment. Guthrie appeals. We have carefully considered the voluminous transcript of evidence concerning what apparently was a sadistic crime, but shall refer to the proof only to the extent necessary for discussion of the points pressed by the appellant as reasons for reversal.

The third floor of the rooming house contained four single rooms, a small apartment and a common bathroom. The rooms were numbered from 5 to 8,

1. The name "Tru-Ade" was blown in the bottle.

both inclusive. On the fateful Friday, room 6 at the front of the house was occupied by the appellant; rooms 5 and 7 were vacant. Francis Moran occupied room 8 and the apartment at the back of the house, numbered 9, was occupied by a Mr. and Mrs. Sugg and their small son.

Guthrie testified that he was in the room with Ruth Leong from about 9:00 or 10:00 o'clock in the morning of November 30 until he left some time near midafternoon while the woman was still there. He had previously decided, he said, to give up his room that day, so he took his luggage with him. He went to his aunt's home in nearby Maryland and remained there continuously until he was awakened at 2:30 a. m. the following Monday by a telephone call from his sister. She told him the police were looking for him and advised him to leave his aunt's home. He left immediately, escaping the officers by ten minutes. On the following Wednesday, December 5, accompanied by an attorney, Guthrie appeared at police headquarters and surrendered.

Moran testified for the government. He came to his room about 2:15 p. m. on November 30 for sandwiches and coffee and stayed some thirty minutes. About 2:30 he heard "drumbling," which he defined as "words which you could not make out," coming from the end of the hall at the front of the house. As he was leaving his room he heard from the same direction a woman's voice say, "Whatever you are doing, please don't do this to me," and "Let's get dressed and go out and eat, and I want to go see my mother and dad."

After leaving his room about 2:45 p. m., Moran went to a picture show and other places and returned to his room about 8:30 or 8:45 p. m. He prepared to shave and started to the bathroom, the door of which was open. A nude woman was standing at the basin, filling a glass with water. She passed him in the hall returning to room 6. He observed that both her eyes were black, her nose was bloody, and her mouth was "beat in." After shaving and returning to his room, Moran heard a woman in room 6 groaning and heard her say, "Please call the cops" or "Call the ambulance. Please get me out of here." He and one Overton, husband of the landlady's daughter, who lived on a lower floor, entered room 6 shortly thereafter and found lying on the bed the woman he had seen in the bathroom, in what he described as a "half-way unconscious" condition.

The police were called and Officers Stroebel and Minnick arrived shortly before midnight. Stroebel testified he heard the woman groaning as he was in the hall approaching room 6. The small room was in disorder and an unclothed woman, with both eyes blacked and face discolored, was on the bed groaning loudly. When the officer asked her what had happened, she replied, "Harry did it," and in a few words described the assault. Her voice was so low he had to lean over with his ear a few inches from her mouth in order to hear. She said she was in terrific pain and screamed as she was carried to an ambulance. Another policeman, who examined room 6 about 1:30 a. m. on December 1, found a Tru-Ade bottle under the bed.

Officers Rudbeck and Clark had a conversation with Guthrie in the psychiatric ward at Gallinger Hospital on the morning of December 12. Rudbeck testified concerning the statements then made by appellant: He first met Ruth Leong on a streetcar on the evening of Wednesday, November 28, as he was returning home from work. She had been drinking and had a black eye. Upon alighting they had beer together and she asked where he lived. He told her his street address but gave her the wrong room number, as he surmised she was a prostitute and he wanted to avoid further contact. He next saw her in the early morning of Friday, November 30, when she came to his room, in a drunken condition and with two black eyes,[2] and asked for

---

2. A policeman testified that he saw Ruth Leong at 6:00 o'clock that morning in a restaurant on Sherman Avenue. At that time, he said, she had just one black eye.

something to drink. She refused the wine he offered and suggested they go out somewhere to get drinks. He remonstrated because he had only been in bed since 3:00 a. m., but finally agreed, and they went to a tavern where each consumed a number of drinks of whiskey "chased" with beer. Leaving the tavern they proceeded by cab to his rooming house, stopping on the way at a liquor store where he bought a bottle of whiskey and two bottles of orange Tru-Ade. When they reached his room they drank from the bottle. He lay down on the bed and she began to undress. At this point we quote from Rudbeck's testimony:

"So he said she started to disrobe, and he said the next thing he remembered—rather, the last thing he remembered he looked at her when she was standing alongside the bed at the dresser with just a girdle on. He said he didn't remember anything from then until he woke up some time later and he noticed there was blood all over the bed and all over her, and she was laying there apparently in pain, and he asked her what had happened. And she said, 'Oh, my God you have hurt me. Get me to a doctor,' or 'Get me a doctor.'

"He said, 'I said I'm not going to get a doctor or get you to a doctor. You are going to have to get up and get dressed and go to the doctor yourself.' "

While the interview was in progress, Officer Clark received a telephone message that Ruth Leong had died and informed Guthrie, who said, according to Rudbeck's testimony, "that if she had died he didn't mean to kill her; that if he did anything to her he didn't mean to kill her."

In his testimony, Guthrie told of his first meeting with Ruth Leong and of the episodes of November 30 substantially as Rudbeck had recounted the story told to him, except that he said he did not remember telling the officer that the woman wanted a doctor and he denied that he told Rudbeck the bed was bloody.

The point most heavily emphasized as ground for reversal is that the trial judge erred in permitting Stroebel to tell the jury Ruth Leong said "Harry did it," and in permitting him to repeat the other statements she made just before midnight. Appellant contends that the woman's accusatory statement, which he says was described as incoherent by one of the officers in the room and which was made at least eleven hours after the alleged assault, several days before death, and in answer to a question, lacked spontaneity and was therefore inadmissible.

■■ It is impossible to formulate a hard and fast rule for determining whether the declaration of a victim of violence is admissible as a spontaneous utterance, that is, whether it was made during a period of nervous stress and shock caused by physical violence when the victim is presumed to be incapable of artifice or premeditation to serve his own interests. The fact that the statement is an answer to a question is not fatal to spontaneity. In Beausoliel v. United States, 1939, 71 App.D.C. 111, 113–114, 107 F.2d 292, 294–295, we said:

"* * * Declarations, exclamations and remarks made by the victim of a crime after the time of its occurrence are sometimes admissible upon the theory that 'under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy * * *.' [3 Wigmore, Evidence § 1747 (2d ed. 1923).] What consti-

tutes a spontaneous utterance such as will bring it within this exception to the hearsay rule must depend, necessarily, upon the facts peculiar to each case, and be determined by the exercise of sound judicial discretion, which should not be disturbed on appeal unless clearly erroneous.

"That the statements in the present case were made in response to inquiry is not decisive of the question of spontaneity, as appellant contends, although that fact is entitled to consideration. Likewise, while the time element is important, it is not in itself controlling. 'Indeed, as has been well asserted, no inflexible rule as to the length of interval between the act charged against the accused and the declaration of the complaining party, can be laid down as established.' "

■ Before admitting the challenged evidence in the present case, the trial judge conducted a painstaking inquiry, out of the presence of the jury, into the circumstances and conditions under which the statement was made. Having satisfied himself that the accusatory and descriptive declarations constituted spontaneous utterances within the exception to the hearsay rule, he permitted Stroebel's evidence to go to the jury. This was the exercise of a judicial discretion which it is generally held should not be disturbed on appeal except for a most compelling reason. We see no such reason here. It is true that Officer Minnick, who was in the room with Stroebel when the statement was made, said the woman was incoherent, but he was not applying the adjective to the accusatory statement because he did not hear it. Minnick also said she appeared to be in great pain and in a dazed or semi-conscious condition and, although he said she was incoherent, he heard her scream, "My God, it hurts."

■■ Nor does the fact that Ruth Leong succeeded in walking to the bathroom about 9:00 o'clock indicate she had emerged from her shocked condition to the extent of being able to reflect and formulate a false self-serving declaration. That journey may well have been the mechanical, subconscious act of one who was still dazed by pain and shock. It is incredible that she then could have been in anything approaching a normal state, when the bottle had been in her body so many hours, particularly in view of her condition just before and when the officers arrived. We hold that, in the circumstances shown, Stroebel's evidence about the woman's statements was properly received.

With respect to the witness Moran, appellant charges three errors in the admission or exclusion of evidence: (a) in the reception of Moran's testimony that he heard a woman's outcries in the afternoon of November 30; (b) in the rejection of proof tending to contradict Moran as to his whereabouts between 3:15 and 5:30 p. m. on that day; and (c) in the exclusion of evidence that blood was found on Moran's bed on December 3 or 4. As to these points:

■ (a) It is argued that Moran's testimony that about 2:45 p. m. he heard a woman's voice, coming from the direction of Guthrie's room, say "Whatever you are doing, please don't do this to me," violated the hearsay rule and was irrelevant as well. We think that, in view of the circumstances and the condition of the victim when she was discovered in room 6, Moran's statement was pertinent and properly received in evidence. The woman's utterance showed something physically painful or at least unpleasant was being done to her and indicated her revulsion or alarm. It was therefore admissible under an established exception to the hearsay rule which admits statements of a person's own mental or physical condition.[3] Moreover, it showed there was trouble going on in room 6 and it tended to fix the time of the assault.

3. Wigmore, Evidence §§ 1714 and 1730 (3d ed. 1940).

**(b)** It is further argued that the court erred in refusing to allow appellant to develop the theory that Moran himself could have committed the crime, and in excluding proffered proof concerning Moran's activity that afternoon. Moran testified he left the rooming house between 2:45 and 3:00 p. m. and went to a motion picture show at the Avenue Grand Theatre, where he remained from about 3:15 until 5:30 p. m. Appellant's offer to prove the Avenue Grand Theatre was not open on the afternoon of November 30 was an obvious effort to show that Moran might have been on the third floor of the rooming house during the time he said he was at the picture show and so might have been the murderer. This offer of proof was correctly rejected as being directed to a collateral matter. The only evidence as to the time of the assault was Moran's statement as to the cries he heard at 2:45 p. m. Appellant himself suggests in his brief that the woman's accusatory statement, made about midnight, was from nine to eleven hours after the assault, which of course fixes the commission of the crime as not later than 3:00 p. m. It was quite irrelevant, therefore, to seek to contradict Moran as to where he was between 3:15 and 5:30 p. m. Moreover, the jury knew Moran was on the third floor when the assault was in progress, but by its verdict rejected the theory that he was or may have been the guilty person.

**(c)** The trial judge erred, says the appellant, in refusing to permit him to prove by the landlady that Moran surrendered his room three or four days after November 30 and that, after his departure, she inspected the room and found blood on the sheets and mattress. Appellant's theory is that this evidence would have tended to prove Moran was guilty of the crime, and would have raised a doubt in the minds of the jury as to whether Guthrie committed the assault.

We think the proffered proof was correctly excluded as irrelevant. A fundamental test of relevancy is whether the conclusion sought to be established is a probable inference from the offered fact. There is no doubt here that the crime was committed on November 30 in Guthrie's room and on Guthrie's bed. There is evidence of Guthrie's admission that he awakened to find himself in a bloody bed with a woman who was injured and bleeding. In those circumstances, we cannot say Moran's guilt is a probable inference from the offered fact that three or four days later blood was found on his bed. That fact, without more, would not tend to implicate Moran and would not explain away or detract from the damaging facts concerning the condition of Guthrie's bed on the day of the crime, and his admissions concerning it.

Complaint is made that the court erred in instructing on the defense of alibi, in failing to tell the jury it was not appellant's duty to prove that defense beyond a reasonable doubt. We think it sufficient that the charge told the jury the government must establish every element of the crime beyond a reasonable doubt, which of course included the defendant's presence at the time the assault was committed. Moreover, there was little evidence tending to establish an alibi, as appellant himself testified he did not leave the premises until approximately 2:30 p. m.

Further error is assigned because the court refused the appellant's request that the jury be charged "on the legal significance of circumstantial evidence." The evidence here was not wholly circumstantial and, as was held by the Seventh Circuit in Ossendorf v. United States, 1921, 272 F. 257, an instruction on circumstantial evidence was properly denied since there was evidence of damaging admissions by the defendant. Officer Rudbeck testified of Guthrie's damaging admission that, when he awakened and found the girl bloody and apparently in pain, she said, "Oh, my God you have hurt me." Moreover, Rudbeck further testified to what was tantamount to a damaging admission when he quoted Guthrie as having said, when informed of the girl's death, "if she had

died he didn't mean to kill her; that if he did anything to her he didn't mean to kill her." We hold there was no error in refusing to instruct the jury on circumstantial evidence.

 Appellant says it was error to permit the introduction, as government exhibits, of certain X-ray films which showed the Tru-Ade bottle lodged in the victim's body, and yet appellant conceded that the bottle itself was properly admitted as an exhibit. We see no error in the introduction of the X-ray films.

Our examination of the record convinces us that Guthrie received a fair trial. The jury's verdict, based on substantial evidence which was largely undisputed, cannot be disturbed.

Affirmed.