UNITED STATES, Appellant

v

JOSEPH EARL ANDERSON, Seaman Apprentice, U. S. Navy, Appellee

10 USCMA 200, 27 CMR 274

No. 12,257

Decided February 6, 1959

*Commander Louis L. Milano,* USN, argued the cause for Appellant, United States.

*Lieutenant Colonel Remmel H. Dudley,* USMC, argued the cause for Appellee, Accused.

GEORGE W. LATIMER, Judge:

The accused was convicted by a general court-martial of an offense of taking indecent liberties with a female child under sixteen years of age, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. He was sentenced to a dishonorable discharge, total forfeitures, confinement at hard labor for five years, and reduction to the grade of seaman recruit. The findings and sentence were approved by the convening authority but subsequently they were reversed by a board of review for reasons which will be set forth shortly. Because of the importance of the legal issues involved, The Judge Advocate General of the Navy certified two questions for our determination.

The facts necessary to a fair understanding of the questions are substantially as follows: The four-year-old victim and her parents lived in a Naval housing area which contained six family dwelling units side by side. Shortly after 10:00 a.m. on Sunday, January 26, 1958, the young child went out of her house to play with several other neighborhood children. Not long thereafter the infant's mother, noticing her absence from the immediate area, commenced calling and looking for her and, after the father was alerted, the two parents conducted a search until approximately 11:00 a.m. At that time they saw their daughter in the backyard of the unit occupied by a family identified as Anderson—relatives of the accused—which was one dwelling removed from their own. When first seen, the child was approximately four or five feet from the Anderson's back door and appeared to have come from that home. She was carrying a small puppy in her arms and, when instructed by her parents to return it, opened the Anderson's rear door and placed the dog inside. Moments later the child was sent back to pick up her shoes which were lying in the neighbor's yard. She then returned to her home but said nothing and was instructed by her mother to sit in her chair, apparently as a form of punishment for not having

responded when called. She was under disciplinary restraint for approximately one-half hour and while there she did not speak to either of her parents but played with her fingers in a manner characterized by the mother as a "nervous habit." After approximately twenty-five minutes, the mother proceeded to comb her daughter's hair, and up until this point nothing in the child's appearance or behavior seemed unusual to the parents. The child then stood up and approached her father in an attempt to regain his good favor. At this point, the alleged victim touched or patted the front of her father's trousers and made a statement which immediately aroused the suspicions of both parents. On further questioning, the child verbally identified the accused and disclosed the actions which subsequently formed the basis of the criminal charge. That afternoon the child again had to relate her experiences because she was interviewed by a policeman attached to the Naval base.

On the following day, the accused executed a pretrial statement in which he admitted that on January 26, 1958, he was visiting with his brother, that at the time in question he was alone in the house, that he allowed the victim to come into the home to play with his nephew's dog, and that while there he fondled the child's body as charged.

At trial, counsel for the Government announced that the child would not be a witness as he intended to lay the foundation for accused's confession by the testimony of the mother. She was thereupon called as the prosecution's first witness. After relating the sequence of events prior to her daughter's disclosure of accused's criminal conduct, she started to state the child's story. Defense counsel objected to the mother testifying to the daughter's remarks on the ground that such statements were hearsay. During an in-court hearing, trial counsel countered defense arguments with the contention that the statements fell within the well-recognized "spontaneous exclamation" exception to the hearsay rule. After

hearing argument by both sides, the law officer ruled in favor of the Government, and the mother's recitation of her daughter's incriminating statements was accepted as competent testimony. In addition, testimony was given by her to establish that the child suffered from nightmares for some weeks after the experience and had to be given sedatives to relieve this condition. Later in the proceedings, accused's pretrial confession was admitted before the court.

The majority of the board of review based its reversal of accused's conviction on a holding that the mother's testimony relating to her daughter's statements was outside the ambit of the "spontaneous exclamation" exception to the hearsay rule and was, therefore, inadmissible. Resultant from this holding was the conclusion that consideration of the purported confession was erroneous and prejudicial due to the complete absence of competent corroborating evidence in the record. On the basis of these holdings, The Judge Advocate General of the Navy has presented the following two questions to this Court for our determination:

"(a) Was the testimony of the mother of the alleged victim concerning the statements made by the latter about the alleged offense admissible in evidence under the spontaneous exclamation exception to the hearsay rule?

"(b) As a matter of law, did the prosecution present sufficient admissible evidence independent of the accused's extra-judicial confession to establish that the particular offense had probably been committed?"

The problem of spontaneous exclamations made by tender-aged victims of sexual misconduct is not new to the law, and the principles involved have been the subject of consideration by this Court on more than one occasion. Frequently in cases of this nature, the only evidence of improper or felonious conduct rests in the statements of the young victim and when, for understandable reasons, the child is not subjected to the unpleasantness of publicly repeating in court the contemptible ·conduct

of adults, the difficult question becomes whether the presentation of the infant's testimony through another must fail on the grounds of incompetency.

In support of the contention that the hearsay testimony in the present case fell outside the exception of spontaneous exclamations, appellate defense counsel have argued inter alia that the period of time intervening between the alleged commission of the act and its disclosure removed the element of spontaneity from the child's statement. We believe the testimony would meet that test, but we need not rule definitely on that point, for we find a more glaring deficiency which places these statements outside the periphery of this exception.

In United States v Mounts, 1 USCMA 114, 2 CMR 20, we were faced with a situation similar in many respects to that presently confronting us. There the victim was a four-and-a-half-year-old boy whose statements to his mother tended to establish an act of sodomy upon him by the accused. The late Judge Brosman, writing for a unanimous Court, considered at length the law and cases bearing upon the question of "spontaneous exclamation" and set out certain requirements for and limitations upon this exception. Among others, the prerequisite of the prosecution presenting independent evidence of an unusual event was stated in the following language:

". . . However, the fact remains that regardless of the verbalization used, there must be some independent evidence of the exciting, startling, or surprising event which circumstantially guarantees the offered hearsay utterance before it may be accepted by the court. It would be faulty and circuitous reasoning with a vengeance to permit the questioned declaration itself to furnish the essential basis for its own guaranty. To allow this would, indeed, be to allow an item of evidence to raise itself to the level of admissibility by its own bootstraps."

This same rule was set out in slightly different language by the United States

Court of Appeals for the District of Columbia in Brown v United States, 152 F2d 138 (1945). In that case, the alleged victim of a sexual assault was a girl of three years and eight months. The court, in considering a contention of spontaneous exclamation, stated:

"Even if the child had been mentally disturbed when she told her story, the present case would not have been within the established doctrine of spontaneous statements. This exception to the hearsay rule has commonly been applied only when there has been independent evidence of an exciting event; testimony other than the hearsay statement has proved that a collision occurred, a shot was fired, or the like, and the hearsay has served only to identify the actors or to specify their conduct." [Citing Wigmore, Evidence, 3d ed, § 1761.]

The court then went on to state:

". . . As we held in the Snowden and Beausoliel cases [Snowden v United States, 2 App DC 89, Beausoliel v United States, 107 F 2d 292 (CA DC Cir)], if a child makes spontaneous statements they are admissible in evidence *when a foundation is laid for them, and either the child's condition or the child's testimony may lay the foundation.*" [Emphasis supplied.]

See also Jones v United States, 231 F2d 244 (CA DC Cir) (1956), where this principle was reaffirmed.

The determination before us then is whether there is some evidence of any exciting, startling, or surprising act alleged in the specification independent of the hearsay testimony. Close scrutiny of the record convinces us there is not. Here, as in the *Brown* and *Jones* cases, supra, the only evidence that any indecent assault took place was the hearsay itself. We have no testimony from the child and no evidence reflecting injury to her. When the mother examined the body of the child after learning of the alleged acts, she found no bruises, scratches, or irritation to indicate that the criminal acts had in

fact been performed. Prior to the statements made by the infant to her parents, there was nothing in her appearance or demeanor which aroused suspicion of foul play. While there was testimony that her dress was wrinkled, we can find nothing striking or unusual in this fact since the child had been playing out of doors with her companions and was carrying a dog when first seen. And the record suggests that the combing of her hair was prompted more by an intention to go visiting than by a particularly disheveled appearance.

To support its case, the Government argues that the child's subsequent nocturnal disturbances furnish the independent evidence, but that theory is too conjectural and speculative. During trial the mother testified that starting on the 26th of January 1958 the child suffered nightmares, frequently several times in one night. While this mental condition might be considered unusual, we are certain the record does not furnish us with any basis for a fair inference that this condition was connected directly or indirectly with the alleged criminal conduct of the accused. Nothing in the testimony of any witness indicates the cause of these nightmares, and we cannot reasonably assign one hypothesis to the exclusion of others. It is argued that the mere appearance of the condition after the incident is sufficient. But in that connection, it is worth mentioning that the child was not physically injured; she was four years old and the indecent liberties taken by the accused would have little significance to her; she was not mentally upset when she was first observed; and her demeanor for over one-half an hour in no way alerted her parents to any unusual incident. Up to that point, we find nothing which would support an inference that the child was so mentally disturbed that her sleep would be interrupted by nightmares. Thereafter she was punished, closely questioned by her parents, and further interviewed by a third party. Whether these later events superimposed upon the former so agitated her mind that she dreamed of a frightful experience, we are not prepared to state, but it is well known medically that nightmares may be

caused by both physical and mental irregularities. Without some evidence to show a causal connection between the alleged incident and the subsequent disorder, it would indeed be sheer speculation for us to enter the field of medicine and find that having nightmares was traceable to accused's conduct.

Appellate Government counsel further argues that because the alleged victim was seen by her parents a distance of four or five feet from the Anderson's back door, there is sufficient evidence to prove the indecent incident. Even were we to assume that this evidence indicated the child's prior presence in that home, we cannot say it tends to establish a shocking or startling event. Aside from accused's confession, there is no competent evidence even showing his presence in the house at the time of the alleged crime. The record does not show that he or anyone else was in the home. It may have been empty of persons or it may have been filled with individuals. For aught that appears, the child may have visited with the Anderson family and come out of their house on many occasions. In short, we find no evidence which would meet the requirement necessary to qualify the mother's testimony as competent evidence. Accordingly, her testimony was inadmissible. We must, therefore, answer the first certified question in the negative.

As conceded by appellate Government counsel, the answer to the second certified issue is dependent upon our conclusions in the first. Paragraph 140a, Manual for Courts-Martial, United States, 1951, sets out the well-settled rule of military practice that a court may not consider the confession of an accused unless there is in the record other evidence to show the offense charged has probably been committed by someone. United States v Isenberg, 2 USCMA 349, 8 CMR 149; United States v Villasenor, 6 USCMA 3, 19 CMR 129; and United States v Mims, 8 USCMA 316, 24 CMR 126. As stated above, the record is barren of any such evidence, and the second certified issue must be answered in the negative.

For the reasons contained herein, the decision of the board of review is affirmed, and the record of trial is returned to The Judge Advocate General of the Navy for action not inconsistent with this opinion. A rehearing may be ordered.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

In my opinion, the majority take too narrow a view of the independent evidence required for the admission of a spontaneous utterance. Thus the *Brown* case,[1] which is heavily relied upon by the majority, expressly holds that the "child's condition . . . may lay the foundation" for the admission of the statement. What condition can we expect when indecent liberties taken with the child are not the kind that leave bruises or marks? What condition can we expect the child to be in if the criminal acts performed on her person are achieved by guile or subterfuge? It seems to me that evidence of mental disturbance on the part of the child satisfies the independent evidence requirement. Certainly, the opinion in the *Brown* case specifically recognizes that possibility, although the court held there was "no evidence" of such disturbance in that case and that the child's statement was a "completely calm narrative." The situation here is different.

There is affirmative evidence to show she acted "strange[ly]" and shied away from her parents when she came into the house; that she was "scared" and "nervous"; that she "fidget[ed] with her hands," a mannerism she employed when "upset"; and, finally, that her first utterances were: "Those people [meaning the Andersons] are at church," and "Do you have a big wee-wee like that man does." These remarks can reasonably be construed as the impulsive expression of a mind excited by what had happened, and not the calm and reflective narrative of a past occurrence. It is, as it were, the event speaking through the child, rather than

---

[1] Brown v United States, 152 F2d 138, 140 (CA DC Cir) (1945).

**205**

the child speaking for herself. In my opinion, therefore, the circumstances justify the law officer's conclusion that the proper foundation was laid.

As to the effect of the time lapse between the event and the declaration, the question is primarily one for the law officer. Pietrzak v United States, 188 F2d 418 (CA5th Cir) (1951). "Literal contemporaneity" is not required. Wharton, Criminal Evidence, 12th ed, § 280. Having in mind the fact that the child's mother made her stay in the corner of the room without speaking and that the first statements made by the child related to the event, I am of the opinion that the law officer did not abuse his discretion in admitting the statement as a spontaneous declaration. Guthrie v United States, 207 F 2d 19 (CA DC Cir) (1953); State v Hudspeth, 159 Mo 178, 60 SW 136 (1900).

Since they were properly admitted, the statements are "proof of the facts which they assert." Brown ▬▬▬ ■ v United States, supra, page 139. The testimony of the search made for the child by the mother clearly indicates the exposure occurred inside the Anderson home. From the child's statement, it appears that the regular members of the Anderson household were away at church at the time. These circumstances are sufficient to show that the offense charged was probably committed. United States v Fioco, 10 USCMA 198, 27 CMR 272. Thus, there is ample independent evidence to corroborate the accused's confession and to support the findings of guilty. I would, therefore, answer the certified questions in the affirmative and set aside the decision of the board of review as incorrect in law.