**UNITED STATES of America,
Appellant,**

v.

**James GLENN, a/k/a James M. Green.**

**No. 71–1865.**

United States Court of Appeals,
District of Columbia Circuit.

Dec. 22, 1972.

Rehearing Denied Jan. 30, 1973.

Messrs. Harold H. Titus, Jr., U. S. Atty., and John A. Terry, Philip L. Cohan, and Raymond Banoun, Asst. U. S. Attys., were on the brief for appellant.

Mr. Ed Wilhite, Washington, D. C. (appointed by this Court), was on the brief for appellee.

Before LEVENTHAL, ROBINSON and ROBB, Circuit Judges.

PER CURIAM:

The appellee Glenn was indicted for the murder of one Juanita Johnson by stabbing her with a knife. Before trial he moved to suppress a statement made by Juanita Johnson minutes after she received the fatal wound and within an hour of her death. After a hearing the District Court granted the motion to suppress. The United States appeals, pursuant to 18 U.S.C. § 3731 (1970) and 23 D.C.Code § 104(a)(1) (Supplement V, 1972). We reverse.

The record establishes without contradiction that Glenn and Juanita Johnson lived together in an apartment at 3407 Sherman Avenue, N.W., in Washington, D.C. Between nine and ten o'clock on the morning of the homicide, August 26, 1970, a neighbor heard them "arguing" and heard Glenn tell Juanita Johnson to "get out". Then they "quieted down" and both left the apartment. Juanita Johnson returned at about one o'clock in the afternoon and around four o'clock the argument resumed. In a loud voice Glenn again told Juanita Johnson to "get out, get out" and Mrs. Johnson said "Glenn, why don't you leave me alone?". Glenn and Mrs. Johnson then "ran down the hall" and the neighbor heard the back door slam.

At about 4:20 P.M. on August 26, Officer Knox of No. 10 Precinct was at the stationhouse when two citizens came in and told him that a woman on the sidewalk outside seemed to be in need of

help. He went out and saw Juanita Johnson approaching the precinct steps from the sidewalk. She had a blood stain on the left front of her dress about the breast. It was stipulated by the parties at the hearing that the officer would testify that

. . . I met her at the bottom of the steps and assisted her up the steps by placing my right arm around her back and shoulders and steadying her with my left hand. As I helped her up the steps and into the precinct she stated "Help me. Help me.". I asked her, "What happened?" and she replied, "He did it". By this time we were inside and as she stated "He did it", and she pulled away from me and lunged toward the counter where Officer Buck Jackson was working. I heard her repeat to him: "Help me. Help me. He did it". I then heard Officer Jackson ask her, "Who did it?" and I heard her reply, "James . . . ". I heard her conversation with Officer Jackson as I was making my way to the back of the precinct to wash the blood from my right shirt sleeve which I had picked up from Juanita Johnson's wound in her back.

The stipulated testimony of Officer Jackson, who was on duty at the counter at the 10th Precinct, was that he saw Juanita Johnson enter the precinct, assisted by Officer Knox and that

. . . As she approached the counter where I was working I observed a small blood stain on the front right side of her chest and also an approximately one-inch cut in her dress in the area of the blood. As she approached she appeared as though she might fall but instead she sort of lunged the several steps necessary to traverse the five foot distance to the counter. She leaned up against the counter and grasped my wrist stating as she came, "Please help me. Please help me. He did it." I responded: "Who is 'he' and what did he do?" She replied: "James . . . ". I though [sic] at first she said, "James Lynn" but I was only certain about the "James".

I was unable to clearly make out the last name so I said "who"? She replied: "James Glenn". I then asked: "Where does he live?" and she replied "3407 Sherman". Then I asked: "What did he do to you?" and she replied, "I don't know because he got me in my back." As she stated this she gestured toward her back and then I noticed that she had blood coming from her back also. There was not, however, enough blood from her front or back to drip onto the floor or elsewhere.

When Juanita Johnson first attempted to tell me the name she gasped as she stated the last name and that is why I was unable to clearly understand her. She was repeatedly gasping for breath and appeared as though she was trying to scream but could not get enough breath.

\* \* \* \* \* \*

Juanita Johnson remained at the counter for approximately 20 to 30 seconds, during which time the above conversation took place. Then I and Officer Knox helped her to a chair. Sitting in the chair she periodically moaned or groaned as though she were in pain. After sitting there for about one minute she began to slump forward. After about four minutes she had slumped so much I feared she would fall onto the floor so I propped her back up. I believe she was still semi-conscious because she continued to groan.

The testimony of Officer Kalinofsky, Desk Sergeant at No. 10 Precinct, was that he saw Juanita Johnson "lunge toward" Officer Jackson and then talk to him, but Kalinofsky did not hear the conversation. He stated that Mrs. Johnson was excited, appeared to be looking for help, and was gasping for breath. He noticed "a small amount of blood on her left breast". After she was helped to a chair he saw her "go limp and lean forward in her chair" and he then called for an ambulance. The ambulance took Mrs. Johnson to the hospital where she was pronounced dead at 5:14 P.M.

A person walking from the bedroom at 3407 Sherman Avenue to the counter at No. 10 Precinct would travel no more than 502 feet.

Dr. William James Brownlee, Deputy Medical Examiner for the District of Columbia, who performed an autopsy on Mrs. Johnson, testified that she had two significant wounds, one in front and one in the back, both involving the chest. The stab wound in the back produced major bleeding into the right chest from the intercostal artery and vein, causing her lungs to collapse and her heart to shift. The doctor concluded that Mrs. Johnson was in pain from her wounds and knew that she was very seriously injured, but he could not say that she believed death was imminent. He added that "I do not feel the majority of people feel they are going to die".

In the doctor's opinion Mrs. Johnson "probably died within half an hour or 45 minutes from the time of the infliction of the wound"; at the most she would not have survived more than an hour and a half.

Dr. Brownlee testified that the autopsy disclosed the presence of "0.28 milligram percent of alcohol" in Juanita Johnson's blood. Although he testified that a normal person would have to consume ten ounces of whiskey in one hour to reach this percentage, he explained that Mrs. Johnson was not a normal person. He found that she was obese, suffering from arthritis of the kidneys, and that she displayed all the metabolic signs which are found in a chronic alcoholic. He concluded that as a "chronic user" she had a tolerance for alcohol and certainly would not lose consciousness at the level found in her blood; on the contrary, he said that such a percentage is "not highly extensive in a major alcoholic". His opinion was that notwithstanding the alcohol in her blood Mrs. Johnson would have been able to perceive that Glenn, with whom she was living, had stabbed her in the chest and in the back, and that she was capable of giving a correct answer if asked who had stabbed her.

The stipulated testimony of the police officers who observed Mrs. Johnson at the stationhouse was that she was weak, gasping for breath and apparently in pain but that she did not appear to be drunk. She did not smell of liquor, her speech was not slurred and she responded quickly and coherently to questions.

On this record the District Court held that Mrs. Johnson's statement at the precinct was not admissible, either as a dying declaration or as a spontaneous or "excited" utterance. The court based its ruling on several factors: 1. Mrs. Johnson did not believe at the time that her death was imminent; 2. the court was "not 100 percent certain" that she was in a state of shock; 3. there was a lapse of time between the infliction of the fatal wounds and the making of the statement; and 4. the alcohol in Mrs. Johnson's blood made her statement "unreliable and suspect".

■ Declarations relating to the circumstances of a violent crime, made by the victim shortly after its occurrence, are sometimes admitted in evidence as exceptions to the hearsay rule, upon the theory that the shock of the injury and the excitement of the moment have produced an utterance that is spontaneous and sincere as distinguished from one engendered by deliberation and design. Such statements may be admissible although made in response to an inquiry. Guthrie v. United States, 92 U.S.App.D.C. 361, 207 F.2d 19 (1953); Beausoliel v. United States, 71 App.D.C. 111, 107 F.2d 292 (1939). Nor is it decisive that an appreciable time elapsed between the infliction of the injury and the making of the statement. United States v. Kearney, 136 U.S.App.D.C. 328, 420 F.2d 170 (1969); Guthrie v. United States, supra. The decisive factor is that the circumstances reasonably justify the conclusion that the remarks were not made under the impetus of reflection. Whether this conclusion is justified depends upon the facts of each case and must be determined by the District Court in the exercise of sound judicial discretion. Such discretionary action is

of course subject to review and must be reversed if clearly erroneous.

■ On the facts of this case we think the District Court was clearly in error since Mrs. Johnson's statement was plainly admissible as a spontaneous utterance.

From the testimony of Dr. Brownlee that Mrs. Johnson probably died within half an hour or 45 minutes after she had been stabbed, and the proof that No. 10 Precinct was only about 500 feet from the scene of the stabbing, it is plain that Mrs. Johnson made her statement only minutes after she was fatally stabbed. She was bleeding from her wounds, in pain, gasping for breath, and about to lapse into unconsciousness followed by death. Her situation was not conducive to detached reflection and deliberation; on the contrary the only reasonable conclusion from the uncontradicted proof is that when she spoke she was in the grip of high excitement. In short, as in the *Kearney* case, *supra,* the circumstances rebut "the possibility that truth was undercut by speculation or fabrication." The percentage of alcohol in Mrs. Johnson's blood, which troubled the District Court, was a factor that went to the weight of her declaration, not to its admissibility. Had she survived and been called as a witness against the appellee, her testimony would have been received, and its weight would have been for the jury. Likewise it was for the jury to assay the weight of her spontaneous declaration.

In addition to the cases we have cited there are many others that support the admission of Mrs. Johnson's statement. See, for example, Insurance Co. v. Mos-

ley, 75 U.S. (8 Wall.) 397, 19 L.Ed. 437 (1869); Grant v. United States, 28 App.D.C. 169 (1906); Commonwealth v. Pike, 3 Cush. (57 Mass.) 181 (Mass. Sup.Ct.1849) cited with approval and discussed by the Supreme Court in Insurance Co. v. Mosley, 75 U.S. (8 Wall.) at 406.[1]

■ Had this issue arisen on the trial of another person for the homicide we would be shocked if the court had kept from the jury the decedent's statement that Glenn and not the defendant on trial was the guilty man. We think the rule should be neutral as between prosecution and defense.

The order of the District Court granting appellee's motion to suppress is reversed and the case is remanded for trial.

It is so ordered.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge, dissenting:

My colleagues, I believe, have supplanted the District Judge's evidentiary ruling with the ruling they would have made had they been acting in his stead. That, in my view, is neither our function nor our prerogative. I must, therefore, respectfully dissent.

**I**

Two wholesome precepts weigh heavily on an appellate court called upon to review evidentiary rulings by a trial court. The first is that the Anglo-American law of evidence vests exclusively in the trial judge the task of establishing the admissibility or inadmis-

---

1. On November 20, 1972 the Supreme Court prescribed and transmitted to the Congress rules of evidence for United States Courts and Magistrates. Rules 803 and 806 recognize and approve the principles we have applied here. Thus Rule 803 provides in part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(2) *Excited utterance.*—A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

Rule 806 provides in part:

When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness.

sibility of evidence in the first instance.[1] An obvious justification for this allocation of responsibility lies in that judge's direct and ready access to the factual information on which the decision to admit or exclude must frequently be grounded. For rulings on evidence often necessitate determinations of preliminary facts, as did the ruling on spontaneity of the proffered statements which the District Judge was required to make here.

As we recently observed in a closely allied context,

> The trial court is not only the traditional but also the superior tribunal for the kind of information-gathering which a sound foundation [for its ruling] . . . inevitably requires. For it is there that, at a hearing, the judge can come face-to-face with the primary informational sources, and probe for what is obscure, trap what is elusive, and settle what is controversial.[2]

The second principle is that the trial court's resolution of a question of admissibility of evidence may be disturbed on appeal only in the event that it amounts, in the familiar idiom, to an abuse of that court's discretion.[3] Rulings of that sort summon the trial judge's appraisal of preliminary facts, his special feel of the case and his over-all judgment on admissibility—all in a flash. The very nature of the trial process demands that the trial judge be indulged some leeway to exploit his intimacy with trial matters.

"Discretion," by definition, involves the idea of choice, of an exertion of the will, of a selection between competing considerations.[4] The Supreme Court has described its proper exercise as the use of conscientious judgment which " . . . takes account of the law and the particular circumstances of the case and 'is directed by the reason and conscience of the judge to a just result.' "[5] And where the discretionary act turns upon an antecedent factual determination, as it does here, "an abuse of discretion involves far more than a difference in judicial opinion between the trial and appellate courts."[6] The challenged action must, we have said, be found to be "arbitrary, fanciful, clearly unreasonable,"[7] or "clearly erroneous"[8] in order to be invalidated on appeal. If, on the other hand, reasonable men could differ as to its propriety, then it cannot be said that the trial judge abused his discretion.[9]

Thus the question on this appeal is a very narrow one. It is whether the Dis-

1. 9 Wigmore, Evidence § 2550 (3d ed. 1940) ; McCormick, Law of Evidence § 53 (1954). The recently proposed Rules of Evidence for the United States District Courts and Magistrates, which were submitted to Congress by the Supreme Court on November 20, 1972, adhere to the principle that evidentiary matters are to be resolved preliminarily by the trial judge. See proposed Fed.R. Evidence 104(a) and the accompanying Advisory Committee Note.

2. United States v. Stanley, 152 U.S.App. D.C. 170, 469 F.2d 576 (1972).

3. United States v. Hardin, 143 U.S.App. D.C. 320, 322, 443 F.2d 735, 737 (1971) ; United States v. Comer, 137 U.S.App. D.C. 214, 217 n. 3, 421 F.2d 1149, 1152 n. 3 (1970) ; Beausoliel v. United States, 71 App.D.C. 111, 113–114, 107 F.2d 292, 294–295 (1939) ; Guest v. Bailes, 448 F. 2d 433, 436 (6th Cir. 1971).

4. Spalding v. Spalding, 355 Mich. 382, 94 N.W.2d 810, 811 (1959).

5. Burns v. United States, 287 U.S. 216, 222–223, 53 S.Ct. 154, 156, 77 L.Ed. 266 (1932), quoting Langnes v. Green, 282 U.S. 531, 541, 51 S.Ct. 243, 75 L.Ed. 520 (1931).

6. Spalding v. Spalding, supra note 4, 94 N.W.2d at 811.

7. United States v. McWilliams, 82 U.S. App.D.C. 259, 261, 163 F.2d 695, 697 (1947).

8. United States v. Hardin, supra note 3, 143 U.S.App.D.C. at 322, 443 F.2d at 737 ; Beausoliel v. United States, supra note 3, 71 App.D.C. at 114, 107 F.2d at 295.

9. Delno v. Market St. Ry., 124 F.2d 965, 967 (9th Cir. 1942).

trict Judge's evidentiary ruling is without any reasonable foundation and is, by the same token, clearly erroneous. I am unable to say that it is.

When a party seeks to introduce hearsay evidence, that party bears the burden of showing that the proffered statement fits into one of the exceptions to the rule outlawing hearsay.[10] Exceptions to the exclusionary rule have grown up only in instances where there is a strict necessity for the evidence and the surrounding circumstances insure a high degree of trustworthiness.[11] Thus this court, in common with others, has held that exclamations by the victim of a crime are sometimes admissible on the theory that the victim was in a state of physical shock producing a condition of nervous excitement sufficient to suspend the deliberative faculties which otherwise might allow him to fabricate his statements.[12] An utterance made under an "immediate and uncontrolled domination of the senses"[13] during a brief period when considerations of self-interest cannot be brought fully to bear by reasoned reflection is thought to possess the requisite reliability.[14] In sum, admission of a statement under the "spontaneous utterance" exception to the hearsay rule requires a determination by the trial court that (a) the declarant was in a state of physical shock (b) which generated the stress of nervous excitement (c) sufficient to still his reflective faculties, thereby preventing any opportunity for deliberation which might lead the declarant to be untruthful.[15]

The application of this test must of necessity depend on the facts peculiar to each case.[16] The trial judge must assess not only the amount of time which has elapsed between the shocking event and the statement, but also the declarant's activities and attitudes in the meanwhile, to determine if there was occasion for deviation from the truth under the impetus of reflection.[17] Our function is to abide that assessment unless it is plainly wrong.[18]

## II

The record on appeal discloses that the District Court had at its disposal the stipulated testimony of police officers who assisted the decedent at the stationhouse at the time she made the statements sought to be admitted, a portion of a statement made by the decedent's neighbor to the police, and extensive tes-

---

10. *E. g.*, Guest v. Bailes, *supra* note 3, 448 F.2d at 436.

11. 5 Wigmore, Evidence § 1420 (3d ed. 1940).

12. Beausoliel v. United States, *supra* note 3, 71 App.D.C. at 113, 107 F.2d at 294. See also 6 Wigmore, Evidence § 1747 (3d ed. 1940).

13. Beausoliel v. United States, *supra* note 3, 71 App.D.C. at 113, 107 F.2d at 294.

14. *Id.*

15. The hearsay exception for spontaneous utterances is incorporated into the proposed Federal Rules of Evidence, see note 1, *supra*. Rule 803(2) permits admission of "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed.R. Evidence 803(2). The Advisory Committee points out that admissibility hinges on whether the utterance was made while the state of excitement endured; and further observes that there are no "pat answers" to the question, "How long can excitement prevail?" Advisory Committee Note, Fed.R. Evidence 803(2).

16. Beausoliel v. United States, *supra* note 3, 71 App.D.C. at 114, 107 F.2d at 295; 6 Wigmore, Evidence § 1750 (3d ed. 1940). See also *e. g.*, United States v. Kearney, 136 U.S.App.D.C. 328, 333, 420 F.2d 170, 175 (1969); Lampe v. United States, 97 U.S.App.D.C. 160, 162, 229 F.2d 43, 45 (1956), cert. denied, 359 U.S. 929, 79 S.Ct. 612, 3 L.Ed.2d 631 (1959); Wheeler v. United States, 93 U.S.App. D.C. 159, 164–165, 211 F.2d 19, 24–25, cert. denied, 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140 (1954); Guthrie v. United States, 92 U.S.App.D.C. 361, 365, 207 F.2d 19, 23 (1953).

17. United States v. Kearney, *supra* note 16, 136 U.S.App.D.C. at 333 n. 11, 420 F.2d at 175 n. 11.

18. See text *supra* at notes 3–7.

timony by Dr. William J. Brownlee, Deputy Medical Examiner for the District of Columbia, who performed an autopsy on the decedent.

Dr. Brownlee indicated that the decedent's wounds were of such a grave nature that a person who had suffered them would go into shock and, in his opinion, would not have survived more than an hour and a half without medical treatment. It appears then, that something less than an hour and a half transpired between the infliction of the wounds and the decedent's responses to officers at the stationhouse. The critical focus of the District Judge's inquiry was whether or not during that undetermined period of time the decedent might have had the capability of reflecting on her answers naming appellee as her attacker.

Dr. Brownlee testified that at the time of the victim's death her blood contained .28 per cent alcohol by volume. His examination also revealed that she was obese and bore the physiological signs characteristic of a chronic user of alcohol. In Dr. Brownlee's opinion, such a person would obtain a higher blood level of alcohol within a shorter length of time than would a normal individual, and would also have a higher tolerance for alcohol. He stated further that it would be impossible for him to say at what blood alcohol level the decedent's auditory and visual perceptions would become impaired, but that at .28 per cent she would have had some changes in her perceptions, both visual and auditory. Nevertheless, he believed that the decedent could have recognized who attacked her if it were someone with whom she had lived for six or seven months, and that she could have correctly answered the questions put to her at the stationhouse regarding her attacker's identity.

But even with this testimony, the District Judge realized that the factors to be considered in evaluating the spontaneity of utterances are *not* the declarant's ability to observe at the time of the incident, nor the declarant's ability to recount what happened.[19] The key question left unanswered by Dr. Brownlee was whether the decedent could have reflected prior to making her statements, and no other witness in the case supplied an answer to that question.

While the medical testimony suggests that the decedent probably had pain from her injuries, it also indicates that the alcohol she had consumed would have served to some extent as an analgesic. Whether this could have alleviated the pain enough to permit deliberation, and the risk of contrivance inherent in an opportunity for deliberation, cannot possibly be determined decisively from the evidence presented to the District Judge.[20] Nor can there be any doubt as to the thorough and conscientious effort of the judge to resolve this question. The transcript of the hearing on the motion to suppress the decedent's statements consumes in excess of a hundred pages of which thirty contain testimony by Dr. Brownlee.[21] Nothing in that transcript sheds light on whether the decedent's reflective faculties were impaired by the

---

19. This is not to diminish the relevance of the decedent's powers of observation and recollection. Clearly a spontaneous utterance would be useless if it pertained to an event inaccurately observed or recalled. But the issue of spontaneity itself encompasses another inquiry as well— whether or not the excitement was of such character and duration as to preclude any opportunity for calculated falsehood.

20. The question which troubled the District Judge concerning the high blood alcohol level does not, as my colleagues suggest, go merely to the weight of the

decedent's statement. If the alcohol dulled the pain sufficiently to allow reflection, the statement would be inadmissible.

21. In Guthrie v. United States, *supra* note 16, the trial court also conducted a "painstaking inquiry" into the circumstances and conditions under which the alleged spontaneous utterance was made. We, in turn, observed that such a careful exercise of judicial discretion should only be disturbed on appeal for "the most compelling reason." 92 U.S.App.D.C. at 365, 207 F.2d at 23. In light of the District Judge's effort here, I would exercise the same restraint.

shock of her injury for the entire period of time—however long it may have been—before she arrived at the stationhouse.[22] I am unwilling to say that *no* reasonable basis existed for concluding that the decedent might not have lost all power to deliberate.

The statements sought to be introduced at appellee's trial are of the most prejudicial sort, and the District Judge was accordingly required to exercise particular care in assessing their reliability.[23] While it may be that another trial judge might have resolved the question of admissibility differently, an appellate judge must guard against the temptation to merely substitute his own judgment for that of the acting judge in scrutinizing exercises of his discretion. This, to be sure, is a grim case, but its grimness cannot be permitted to obscure proper standards, either of admissibility or review.

I think the ruling under challenge quite easily passes muster. The spontaneity of the statements sought to be introduced is open to serious question. The District Judge's conclusion on that score falls well within the zone of reasonableness. For our part, in reviewing his action, we would do well to recall what we said in an analogous situation:

> The matter is, we reiterate, one for the exercise of discretion; and, as is generally in accord with sound judicial administration, that discretion is to be accorded a respect appropriately reflective of the inescapable remoteness of appellate review.[24]

Like my colleagues, I believe the spontaneous exclamation exception is a rule

indifferent to the party invoking it. The statements challenged here encounter difficulty whether offered to exonerate or to incriminate.[25] They become no more admissible to condemn appellant by naming him than they would have been to acquit him had they named somebody else. The District Judge, focusing not on the content of the utterances but on the circumstances under which they were made, deemed them beyond the pale of spontaneity. According that determination the respect that is due, I would affirm.

22. I cannot agree that "it is plain" that the decedent made her statement "only minutes" after she was fatally stabbed. See p. 195, *supra*. There is no evidence as to precisely when she left her apartment, nor do we know just how she got to the stationhouse. Crediting the approximations of the decedent's neighbor and Officer Knox, some twenty minutes elapsed between her departure from home and arrival at the precinct.

23. The District Judge in his ruling makes specific mention of the statement given by decedent's neighbor to the police con-

cerning arguments between the decedent and appellee which recurred throughout the period in which they lived together. This evidence of hostility warrants even greater caution in ruling on statements prior to the making of which there could have been an opportunity for fabrication.

24. Luck v. United States, 121 U.S.App. D.C. 151, 157, 348 F.2d 763, 769 (1965).

25. The statements were not of a confessionary nature. See 5 Wigmore, Evidence § 1476 (3d ed. 1940) ; proposed Fed.R. Evidence 804(b)(4) and accompanying Advisory Committee Note.