John C. YOUNG, Appellant,

v.

UNITED STATES, Appellee.

No. 10444.

District of Columbia Court of Appeals.

Submitted Nov. 23, 1977.

Decided Aug. 17, 1978.

---

Patrick J. Christmas, Washington, D. C., appointed by the court, was on the brief for appellant.

Earl J. Silbert, U. S. Atty., and John A. Terry, Theodore A. Shmanda, and Ann P. Gailis, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee.

Before KELLY, GALLAGHER, and HARRIS, Associate Judges.

HARRIS, Associate Judge:

Appellant was convicted by a jury of second-degree murder for a fatal stabbing. D.C.Code 1973, § 22–2403. He contends that the trial court committed reversible error (1) by ruling that statements which had been made by the decedent concerning the stabbing were admissible as spontaneous utterances, and (2) by giving the jury a specific instruction concerning dying declarations at the conclusion of the testimony of three witnesses to the declarations, rather than after the first witness' testimony. We affirm.

I

On November 6, 1974, appellant spent most of the day at the home of John Norman. He drank much wine and whiskey with Norman, Joseph Johnson, and the decedent (Charles Clarke). At about midnight, Norman went to bed, leaving appellant, decedent, and Johnson in the kitchen.

Norman's testimony was that at about 5:00 a. m., he was aroused by a "rumbling downstairs." He proceeded downstairs to the kitchen. Finding no one in the house, he went to the front door. He looked across the street, and saw appellant and the decedent fighting. The decedent suddenly grabbed his side and ran away through an alley. Appellant then returned to the house.

Norman's son William, who also lived in the house, testified somewhat differently from his father. William Norman stated that he was aroused at "around five-thirty" in the morning by loud voices coming from his father's room. William went to his father's room and found him and appellant talking about the decedent's having broken some glass. The three went to the kitchen to look at the broken glass. While in the kitchen, appellant opened a drawer and pulled out a knife which he stuck "down in his side." The three proceeded to the front door, and when they reached it, appellant went into the street to meet the decedent, who was brandishing a trash can top. John and William Norman remained at the front door and watched from there. Appellant grabbed a pole from the fence gate and tried to hit the decedent with it, while the

decedent attempted to ward off the blows with the trash can top. Appellant then struck the decedent across the knees, causing him to drop the trash can lid and retreat, limping, into an alley. Appellant took a few steps after the decedent and then returned to the house, where he replaced the knife in the kitchen drawer.

At about 5:50 a. m., two police officers in a marked cruiser were flagged down by an unidentified man who stated that the decedent had just been stabbed. The decedent and the unidentified man were in the street, approximately 400 feet from John Norman's house. The decedent was bleeding profusely, and he showed the officers a stab wound. The decedent stated that he had been stabbed by "Big Junior," which is appellant's nickname. He also said, "Give me your gun and I'll go get him," and "Just bandage me up so I can go and kill him."

The decedent was taken to the hospital. At about midnight on November 7, 1974, which was the day of the stabbing, the decedent's aunt, her daughter, and her niece visited him in the intensive care unit. During that visit, the decedent stated that he was in great pain and that he was "not going to make it." He instructed his aunt to give everyone his love. The decedent also made statements identifying his assailant and describing him as a stocky, bald-headed, brown-skinned man who lived with John Norman. The decedent died approximately eight hours after the visit from his relatives.

## II

■ We first address appellant's claim that it was error for the trial court to admit into evidence as spontaneous utterances the decedent's on-the-scene statements to the two policemen concerning his stabbing. There is a well-recognized spontaneous utterance exception to the rule of nonadmissibility of hearsay statements. *See* McCormick, Evidence § 297 (2d ed. 1972); Wigmore, Evidence §§ 1745–64 (3d ed. 1940).

We recently have enunciated the elements necessary for the application of the spontaneous utterance exception to the hearsay rule. In another case involving a statement by the victim of a fatal stabbing shortly after its occurrence, we identified the elements permitting the introduction of such evidence as

(1) the presence of a serious occurrence which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances, which in their totality suggest spontaneity and sincerity of the remark. [*Nicholson v. United States*, D.C.App., 368 A.2d 561, 564 (1977).]

"What constitutes a spontaneous utterance depends upon the facts peculiar to each case and such utterance is admitted in the exercise of sound judicial discretion which is not disturbed on appeal unless clearly erroneous." *Ibid.* The decisive factor is whether the circumstances reasonably justify the conclusion that the remarks were not made under the impetus of reflection. *Ibid.; United States v. Glenn,* 154 U.S.App.D.C. 61, 64, 473 F.2d 191, 194 (1972). The fact that the statement was made in response to an inquiry does not demonstrate a lack of spontaneity. *Nicholson v. United States, supra,* at 564; *United States v. Glenn, supra,* 154 U.S.App.D.C. at 64, 473 F.2d at 194.

■ The facts of this case strongly support the conclusion that the statements made by the decedent to the police officers near the scene of the crime were not given under the impetus of reflection. The officers apparently came upon the decedent shortly after he had been stabbed.[1] He was bleeding profusely from what proved to be a fatal wound. He was extremely excited and repeatedly asked the officers to let him go kill his assailant. He also repeated the

---

1. The Normans were aroused at around 5:00 a. m., and the police officers found the decedent at approximately 5:50 a. m. The logical inference, therefore, is that the stabbing occurred shortly before the police officers' arrival.

name of his assailant over and over. Such circumstances reflect that the decedent was in a state of nervous excitement as a consequence of his being stabbed and that his statements were spontaneous, sincere, and devoid of any reflection. The statements fall within the spontaneous utterance exception to the hearsay rule and properly were admitted.

## III

Appellant's second contention is that the trial court erred in giving a cautionary instruction to the jury only after the testimony of the third witness to the dying declarations of the decedent. The trial court found, and appellant apparently concedes, that the statements which were made by the decedent to his aunt, her daughter, and her niece in the hospital room approximately eight hours prior to his death were dying declarations and therefore are excepted from the hearsay rule. The court allowed the women to testify as to the decedent's statements. After the testimony of the first of the three witnesses (the decedent's aunt), appellant's counsel requested an immediate cautionary instruction on dying declaration testimony. The court, noting that two more witnesses were to testify to the same effect, declined to instruct the jury on the dangers of dying declaration testimony and the weight which should be accorded it until after the testimony of the last of the witnesses. In its final instructions, the court also cautioned the jury twice during its instruction on dying declarations (and once during its instruction on spontaneous utterances) that the statements which had been testified to were not rendered under oath and had not been subjected to cross-examination. In addition, the court gave the standard instruction on the credibility of witnesses, advising the jury to consider "whether the witness impresses you as having an accurate memory and recollection, [and] whether the witness had full opportunity to observe the matters concerning which he has testified."

It is appellant's contention that the instructions given by the court were insufficient to prevent the jurors' thoughts from building upon the "wrong assumption," thereby prejudicing appellant. He argues that only if a cautionary instruction is given after the testimony of the first of a series of witnesses to a dying declaration may reversible error be prevented. We find this argument unpersuasive.

There is no requirement that the jury be given a cautionary instruction on the dangers of dying declaration testimony or the weight which should be accorded it. Indeed, we believe that any instruction to the jury on the purported dangers of such testimony or the weight to be accorded it constitutes an unwarranted comment on the evidence which usurps the jury's factfinding role, as it impairs the jury's ability to analyze all the evidence freely and independently, evaluating for itself the credibility of witnesses and according their testimony whatever significance the jury feels to be appropriate. We see no reason why dying declaration testimony should be treated differently from all other testimony, the weight of which is decided by the jury without specific comment from the court. As one authority aptly puts it: "[I]t seems wiser to leave the weight of the declaration to the argument of counsel, the arbitrament of the jury, and the consideration of the judge on motion for new trial." McCormick, Evidence, *supra*, § 286 at 685; *see also, e. g., People v. Warren,* 259 Ill. 213, 102 N.E. 201 (1913); *State v. Pearce,* 56 Minn. 226, 57 N.W. 652 (1894); *Wilson v. State,* 86 Nev. 320, 468 P.2d 346 (1970); *State v. Wright,* 36 N.M. 74, 8 P.2d 443 (1932); *Commonwealth v. Brown,* 388 Pa. 613, 131 A.2d 367 (1957), *explained in Commonwealth v. Edwards,* 431 Pa. 44, 244 A.2d 683 (1968); *Evans v. Commonwealth,* 161 Va. 992, 170 S.E. 756 (1933).

Concluding that there was no reversible error in the challenged actions of the trial court, and finding that there was substantial evidence to support appellant's conviction, we affirm.

*Affirmed.*