**Martin A. BROWN, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 08–CF–693.

District of Columbia Court of Appeals.

Argued Jan. 5, 2011.

Decided Sept. 1, 2011.

Alice Wang, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Peter S. Smith, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III and Charles Cobb, Assistant United States Attorneys, were on the brief, for appellee.

OBERLY, Associate Judge:

A jury convicted appellant Martin "Tony" Brown of second-degree murder while armed, based largely on statements made by the victim, his grandfather. Appellant argues that (1) the trial court erred by admitting the victim's statements under the excited utterance exception to the hearsay rule, (2) admission of the statements violated his rights under the Confrontation Clause, and (3) there was insufficient evidence to prove that appellant was armed with a dangerous weapon. We hold that appellant's claims lack merit and affirm his conviction.

## I. Factual Background

Appellant lived with his eighty-nine-year-old grandfather, Howard Brown, who was last seen uninjured in his home on December 7, 2006, sometime between noon and 1:00 p.m. At about 5:00 p.m. on that date, Brown was found lying on the floor in a "massive amount" of his own blood, with his head "busted open" (with three deep gashes), still bleeding from his open wounds, and with his "ear hanging off." He had a telephone receiver in his hand. His initial sounds as he spoke to the first neighbors on the scene (Chris Irby and Malanda Mias) were only grunts. After the neighbors found Brown, the scene became "chaotic" and "frightening," as one neighbor was "screaming pretty violently" and others were yelling hysterically, loud enough to be heard by the 911 operator and in the neighboring house. When neighbor Patricia Johnson, a nursing assistant, arrived on the scene she took Brown's pulse and, finding none, thought he was dead, but he then opened his eyes and she spoke to him, "trying to orient" him. Johnson testified that when she asked Brown how he was feeling, he said,

"I'm not doing so good," and that when she asked Brown what had happened, he said he did not know. When she then asked him who had done this to him, Brown "responded with 'Tony'" (appellant's nickname). Mias testified at trial that she, too, "asked [Brown] who did this to him," and that he "sound[ed] like he was trying to catch his breath" and said "Tony." Johnson kept talking to Brown to keep him focused and to prevent him from lapsing into unconsciousness. Asked whether Brown seemed dazed or in shock, Johnson answered that he appeared to be in shock.

Alan Trimble, a paramedic who arrived on the scene within five to ten minutes of the neighbors finding Brown, testified that the blood-drenched carpet in the house squished under his feet as he walked near Brown. Trimble testified that Brown was still bleeding at the time and was coming in and out of consciousness, and that, in the ambulance on the way to the hospital, Brown, who continued to bleed from his head, was "very emotional," "obviously in pain," and "in a lot of distress." Neighbor Shirron Spivey testified at trial that she rode to the hospital in the front of the ambulance and that she heard one of the ambulance staff ask Brown "who did this" and he "told them Tony did it."[1] The trauma surgeon who attended Brown at the hospital had to perform "urgent repair" to keep Brown, who still "had severe bleeding," from "exsanguinating . . . [i]n layman's terms, bleeding to death." Later, when doctors, police, or family members asked him what happened, Brown said he did not know or "did not know him[.]"

Sometime after December 7, 2006, Spivey talked to appellant about visiting his grandfather in the hospital, and appellant told her, "I can't go see my grandfather. How do you think I would feel if he recognized me?" He added, "I'll go if you go with me." In January 2007, appellant told Elsie Spivey, Shirron's sister, that he had killed the person who assaulted his grandfather, and he threatened to "duct tape [her] mouth" and "put [her] in the garage," because she had been talking about appellant "doing this to his grandpa."[2] The government also presented evidence that appellant may have believed (mistakenly, it seems) that he would inherit the house in which he and his grandfather lived upon his grandfather's death. On March 28, 2007, Brown died as a result of his injuries.

The court held a hearing prior to appellant's trial to determine whether statements made by the victim were admissible under the excited utterance or dying declaration exceptions to the rule against hearsay and ruled that the statements were admissible as excited utterances.

## II. Legal Principles

 "Whether a statement constitutes [an excited] utterance depends upon the particular facts of each case." *Smith v. United States*, 666 A.2d 1216, 1222 (D.C. 1995). Where, as here, the issue was preserved for appeal, our review focuses on the different aspects of the trial court's decision-fact—finding, application of the law, and exercise of discretion. *See Dutch v. United States*, 997 A.2d 685, 689 (D.C. 2010) ("We review a trial court's decision to admit hearsay evidence for abuse of discretion; however, the determination of whether a statement falls under an excep-

---

1. Trimble confirmed that, in the ambulance, he asked Brown who had assaulted him and that Brown was able to speak, but Trimble could not remember what Brown said in response to the question.

2. Appellant was charged with threatening Elsie Spivey, but the jury was unable to reach a verdict on this count.

tion to the hearsay rule is a legal conclusion, which we review *de novo.*"); *Odemns v. United States,* 901 A.2d 770, 776 (D.C. 2006) ("the underlying factual findings are reviewed under the 'clearly erroneous' standard and ... the decision whether to admit or exclude the proffered statement, based on those factual findings, is reviewed for abuse of discretion"). In determining whether the trial court abused its discretion, we consider "not only whether the judge erred in the ruling but also whether the error was of a magnitude requiring reversal." *Newman v. United States,* 705 A.2d 246, 257 (D.C.1997) (citing *(James) Johnson v. United States,* 398 A.2d 354, 366–67 (D.C.1979)).

■ Our precedents establish that for a statement to be admissible under the excited utterance exception, "it must be characterized as a spontaneous declaration, not only tending to explain the act or occurrence with which it is connected but also indicating a spontaneous utterance of a thought while under the influence of that act or occurrence, with no opportunity for premeditation or deliberation." *Watts v. Smith,* 226 A.2d 160, 163 (D.C.1967); *Harris v. United States,* 373 A.2d 590, 593 (D.C.1977) (concluding that "the trial court did not err in finding that during the time decedent was in the emergency room he was substantially and predominantly under the influence of the trauma which had been inflicted upon him, and that the declarations which he made at the time ... do qualify as exceptions to the hearsay rule under spontaneous declarations" (quotation marks omitted)). We have said that for the excited utterance exception to apply, there must be "(1) the presence of a serious occurrence which causes a state of nervous excitement *or* physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the

declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances, which in their totality suggest spontaneity and sincerity of the remark." *Odemns,* 901 A.2d at 776 (emphasis added).

## III. Brown's Statements Were Properly Admitted as Excited Utterances

■ The trial court found that the record showed "a serious occurrence which would cause anyone to be in a state of nervous excitement or physical shock"; that Brown was "barely conscious [and] bleeding profusely on the floor of his home" and that his breathing was "difficult"; and that "Brown was in a state of physical shock, if not also nervous excitement at 5:00 p.m. that afternoon." The court also found that "in the totality of the circumstances, there [was] an indication of spontaneity and sincerity" in Brown's utterance, because he was "barely conscious" when his neighbors arrived, and because he was "still extremely seriously injured, and physically, if not mentally impaired at the time and [his neighbors] were the first persons to whom he had a chance to utter any words after the experience of the assault against him." The court also found "very little in this record to suggest that [Brown] was in any position to do anything by way of premeditation, calculation, construction, or any other fabrication of a falsehood." The court found it "important" that the "first persons [Brown] saw after being beaten, were the ones to whom he made the utterance immediately as soon as he was nudged into consciousness." The testimony summarized above supports each of the court's factual findings, and the record also supports the trial court's legal conclusion that Brown's statements identifying "Tony" as his attacker were admissible as excited utterances.

■ There is no dispute that there was a serious and startling occurrence that caused Brown to sustain his injuries. There also should be no dispute that Brown, who was bleeding profusely, barely conscious, grunting, and needing to "catch his breath" at the time he uttered "Tony," remained "under the influence of" that serious occurrence when he spoke to his neighbors and to the paramedic. *See Watts*, 226 A.2d at 163. The uncontroverted testimony that Brown "looked like he was in shock" when Johnson roused him (just before he responded to her "who did this" question by answering "Tony"), was "very emotional," "obviously in pain," and "in a lot of distress" when in the ambulance, and had nearly bled to death, establishes that the serious occurrence caused both "nervous excitement" and "physical shock in the declarant." [3] *Odemns*, 901 A.2d at 776. To be sure, Trimble described Brown's demeanor in the ambulance, minutes *after* Brown made the utterance "Tony" to Johnson and to Mias while still lying on the floor. Although our dissenting colleague urges that "[o]ur focus must be on [Brown's] condition 'at the time the statement was uttered' " (*post* at 138 n. 1, quoting *Alston v. United States*, 462 A.2d 1122, 1127 (D.C.1983)), there is no reason to think that Brown's demeanor was any different a few minutes earlier, and no reason why *Alston* precludes us from relying, in appropriate circumstances, on a description of a declarant's mental state moments after he spoke to draw inferences about the declarant's state of mind at the time he spoke. Especially in light of Johnson's testimony about Brown looking like he was in shock, it is reasonable to infer that Brown was rendered nervous and excited upon being nudged into consciousness and oriented to his situation at the same time that his neighbors were screaming hysterically and as he recognized that he was "not doing so good." Further, as noted above, Spivey testified that she heard Brown respond while in the ambulance that "Tony did it"—a response Brown gave at the time when, according to Trimble, he was highly emotional, in distress, and in pain.

■■ The trial court recognized that an excited utterance must be made "within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it," *Odemns*, 901 A.2d at 776, but did not make a finding as to the approximate time when the attack occurred.[4] However, "the time ele-

---

**3.** As to "nervous excitement," although Johnson is a nursing assistant, nothing in the record suggests that she intended her comment about Brown looking like he was in shock in a medical sense. She made her statement "I guess you can say he looked like he was in shock" in answer to the inquiry, "He was dazed, right? He looked like he was in shock?" The context suggests that Johnson used the term "shock" according to what the dissenting opinion considers the "general" definition: "sudden agitation or excitement of emotional or mental sensibilities." WEBSTERS NEW INTL. DICT. 2317 (2d ed.1952). Contrary to the dissent's view, on this record we can scarcely call this an "uncritical use" or "rote recitation[ ]" of the word "shock." *Post* at 138.

Johnson, who testified that she felt no pulse in Brown's neck and thought he was dead, recounted that when he opened his eyes, he "scared the hell" out of her and that she had to "catch up with [her] heart" and get over her "initial shock" before she could speak to Brown. This does not prove that Brown felt the same emotions, but it is an additional factor supporting an inference, that he, too, would have been "scared" and in "shock" as he was nudged into consciousness, heard neighbors screaming, and witnessed Johnson's reaction.

**4.** The court recognized that the attack "might have been as recently as five minutes before the arrival of his neighbors. It might have been as early as around noon when he was

ment is not controlling." *Alston,* 462 A.2d at 1127; *see also Snowden v. United States,* 2 App.D.C. 89, 94 (D.C.Cir.1893) ("[N]o inflexible rule as to the length of interval between the act charged against the accused and the declaration of the complaining party, can be laid down as established."). Further, an inference that the attack occurred closer to 5 p.m. (the time when Brown was found) than to noon (the last time he was seen before the attack) would not have been unreasonable. Notably, defense counsel urged the jury to conclude, from the facts that the carpet squished with blood when the paramedic walked on it and that Brown had not bled out despite his gaping wounds, that the attack occurred closer to 5 p.m. than to noon. Although the government could not discount the possibility that five hours passed between the attack and Brown's utterances, for the excited utterance exception to apply, the time between a startling event and an utterance need not be proven beyond a reasonable doubt or even by clear and convincing evidence. *See United States v. Woodfolk,* 656 A.2d 1145, 1150 n. 14 (D.C.1995) (noting that "preponderance of the evidence is the proper standard of proof for determining the admissibility of an excited utterance").

 In any event, we have recognized that even where a startling occurrence

happened hours before an utterance was made, the utterance may be admissible under the exception if it was made when an ensuing event made the speaker newly aware of the gravity of the occurrence. *See Price v. United States,* 545 A.2d 1219, 1226 (D.C.1988) (utterance was admissible even though it was made three hours after declarant witnessed a shooting, because it was made during a phone call in which declarant learned that her lover had been severely injured during the gunfire). The evidence supports our conclusion that Brown's having been nudged into consciousness while his neighbors were screaming hysterically, and his recognition at that time that he was not "doing so good," constituted a startling event. His utterances followed *that* "event"[5] quite closely in time, without his having time for deliberation or fabrication, and, in light of his physical condition, without his having the capacity (as the trial court put it) "to do anything by way of premeditation, calculation, construction, or any other fabrication of a falsehood" before he responded to questioning.[6] *Cf. People v. Robinson,* 41 A.D.3d 1183, 837 N.Y.S.2d 800, 801 (2007) (reasoning that where victim made a statement when he was barely conscious and had difficulty breathing, the evidence established that his statement was "not made under the impetus of studied reflec-

seen uninjured by a witness. And it might have been anytime in between those two times."

5. The dissent contends that Brown's utterances do not "relate to" this second startling event. *Post* at 139. But Brown uttered "Tony" in response to questioners nudging him back to consciousness as he lay in a pool of his own blood on his living room floor, and asking "who did this to him" as at least one of his neighbors was "screaming ... violently." "The startling event or condition need not be the principal act underlying the case. For example, a later startling event may trig-

ger associations with an original trauma, recreating the stress earlier produced and causing the person to exclaim spontaneously." *State v. DiBartolo,* No. 17261–9–III, 2000 WL 968474, at *14, 2000 Wash.App. LEXIS 1195, at *41–42 (Wash.Ct.App. July 13, 2000) (citations and quotation marks omitted). That aptly describes the situation here.

6. Thus, we agree with the government's argument that "because of Mr. Brown's great pain, and because he had just been startled into consciousness by Ms. Johnson, ... he lacked the opportunity to reflect on his statement."

tion") (citation and quotation marks omitted); *see also* 2 McCormick, Evidence § 272 at 255 (6th ed.2006) (noting that the rationale for the excited utterance exception "lies in the special reliability that is furnished when excitement suspends the declarant's powers of reflection and fabrication"). However long Brown might have been conscious and able to deliberate after the attack and before he was found (which apparently was not long enough for him to use the telephone receiver that was in his hand to dial 911 or otherwise call for help), the evidence supports an inference that his utterances when his neighbors found him barely conscious would not likely have resulted from deliberation.[7] *Cf. State v. Ward*, 2001 WL 287472, at *8–9, 2001 Wash.App. LEXIS 485, at *23–24 (Wash. Ct.App. Mar. 26, 2001) (reasoning that even though evidence showed that victim had time to fabricate before he placed a 911 call and did actually lie to the 911 operator, his statement to police officer who arrived on the scene was admissible as an excited utterance, because by that time the victim had nearly bled to death, had no pulse, and was barely conscious, such that his statement to the officer "was unlikely to have resulted from the exercise of choice or judgment").

■ Finally, the trial court did not err by concluding that the circumstances in their totality suggested that Brown's utterances were spontaneous and sincere. The foregoing discussion explains why the utterances appear to have been spontaneous—meaning not "the result of reflective thought" and not "made under the impetus of reflection." *Simmons v. United States*, 945 A.2d 1183, 1189 (D.C.2008). In addition, the trial court found—and the record supports a finding—that "all [Brown] said

over and over" was "Tony." Mindful of the preponderance-of-the-evidence standard that the trial court was required to apply and the "clearly erroneous" standard that applies to our review, we see no reason to disturb the trial court's conclusion that although Brown's utterance "Tony" might have been the "product of confusion" or might have indicated "who he wanted to contact," the "most likely interpretation" is that "he meant ... that Tony is the one who did it." The dissenting opinion cites the evidence (from the portion of the trial transcript that discusses what could be heard on the tape of the 911 call) that, around the time when Brown uttered the word "Tony" in response to Johnson's question "who did this to you," neighbors were asking, "Where's Tony?" and "hollering" up and down the stairs to see whether Tony was in the house. *Post* at 140. Our colleague concludes that this circumstance renders Brown's utterance "Tony" untrustworthy—as if what Brown did was parrot the name he heard called. *Id.* But Mias and Spivey, too, testified that they heard Brown answer "Tony" to the question "who did this?," and there was no evidence that the name "Tony" was being spoken by others at the time when Brown made the utterances that Mias and Spivey heard. In addition, there was testimony that others' names were also spoken to Brown—Johnson testified that she said to Brown, "this is Pat, and Sherrin [sic] is here"—but no evidence was presented that Brown parroted those names.

■ Finally, we are not troubled by the inconsistent responses to inquiries about the identity of his assailant that Brown provided while in the hospital. For purposes of determining the admissibility of the utterances Brown made immediately

---

7. Such an inference was well within the ken of the trial court, without the need for expert testimony or additional proof.

after he was discovered, we are not entitled to judge trustworthiness by comparing those utterances to other evidence. "We have held that [when determining whether statements fall within the excited utterance exception] the trial court *should focus on the circumstances ascertainable upon utterance of the statement,* not on other circumstances that might become known at trial or hearing." *Reyes v. United States,* 933 A.2d 785, 790 n. 6 (D.C.2007) (emphasis added) (citing *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("hearsay evidence used to convict a defendant must possess the indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial.... Thus, we must look to the statement itself and to the circumstances of its delivery for evidence of its inherent reliability.")).[8] Therefore, for purposes of the analysis of the admissibility of Brown's utterance, the trial testimony by Brown's granddaughter—that when she visited Brown at various hospitals after the attack he told her that he did not know who had attacked him—is irrelevant. Nor is it relevant for purposes of the excited utterance analysis that, weeks after the attack, when asked by his doctor at the National Rehabilitation Hospital whether he "knew what had happened," Brown said that "he did not know anything that happened." [9] This evidence was, of course, grist for the defense at trial, but it does not render erroneous the trial court's decision to admit as excited utterances the first utterances Brown made when his neighbors found him bleeding and barely conscious.[10]

## IV. The Evidence that Appellant Was Armed with a Dangerous Weapon Was Sufficient

 D.C.Code § 22–4502 imposes an additional penalty for committing a crime "when armed with or having readily available any ... dangerous or deadly weapon." In the District of Columbia, "stationary objects" or "attached ... fixture[s]" that are "a pre-existing part of the surroundings" are not "weapons" within the meaning of the statute. *Edwards v. United States,* 583 A.2d 661, 664–68 (D.C. 1990). Appellant argues that the government failed to introduce sufficient evidence that he was armed with "a dangerous weapon" because Brown's injuries "could have been caused by being repeatedly slammed against the stationary fixtures in his living room[.]"

 Viewed in the light most favorable to the government,[11] the evidence permit-

---

8. *Cf. People v. Fratello,* 92 N.Y.2d 565, 572, 684 N.Y.S.2d 149, 706 N.E.2d 1173 (N.Y. 1998) (recognizing the analogous principle that "[g]enerally, the bias of an excited utterance declarant functions as a basis for impeachment of the declaration, thus pertinent to the weight, rather than admissibility of the declaration" (citing 6 Wigmore, Evidence § 1751 at 224 (Chadbourn Rev.1976))).

9. This latter evidence was not actually inconsistent with what Brown said to Johnson when he was found: He answered "I don't know" in response to the question "what happened?," but responded with "Tony" when asked "Who did this to you?"

10. Appellant's argument that Brown's statements were testimonial (and therefore barred by the Confrontation Clause) is also without merit. Brown's statements were made to his neighbors (and not police), the setting was frantic and informal, he was severely injured, and the "statements and actions of both [Brown] and [his] interrogators" do not indicate that "a person in [Brown's] situation would have had a 'primary purpose' 'to establish or prove past events potentially relevant to later criminal prosecution.'" *Michigan v. Bryant,* —— U.S. ——, 131 S.Ct. 1143, 1160, 1165, 179 L.Ed.2d 93 (2011) (quoting *Davis v. Washington,* 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)).

ted the jury to infer that the assailant used a dangerous weapon, that is, a detached object rather than an attached fixture, to cause Brown's injuries. Even though police did not recover the object itself, "the government may prove the existence of a weapon by adequate circumstantial evidence." *In re M.M.S.*, 691 A.2d 136, 138 (D.C.1997) (citing *Paris v. United States*, 515 A.2d 199, 204 (D.C.1986)).

In *Edwards*, the "government's theory of the case was that Edwards assaulted his wife by repeatedly slamming her head against the bathtub, sink, and toilet in the bathroom of their apartment." 583 A.2d at 662. We accepted that theory as providing the factual basis for the conviction and concluded that the legislature had not intended the enhancement provision to cover such objects. *Id.* at 667–68. Here, by contrast, no one suggested that Brown's head had been rammed into a stationary object.

The medical examiner who conducted the autopsy testified that Brown had been "beaten about the head." When asked whether "a hand was used or an object was used to cause" his injuries, she responded, "I don't believe it was a hand because of the skull fracture." One of Brown's neighbors, Irby, testified that it looked "like someone hit [Brown] with something." The testimony and photographs admitted at trial also indicated that the blood on the walls, ceilings, and shelving in the decedent's home was blood spatter. Bearing in mind that the government "need not disprove every theory of innocence in order to sustain a conviction," *Olafisoye v. United States*, 857 A.2d 1078,

1086 (D.C.2004) (quotation marks omitted), we think the jury reasonably could have inferred that Brown was assaulted with a detached object. *See Paris*, 515 A.2d at 203–04.

## V. Conclusion

Because the trial court did not abuse its discretion by admitting Brown's statements as excited utterances, and appellant's other arguments are meritless, we affirm the judgment of conviction.

*So ordered.*

FISHER, Associate Judge, dissenting:

"[T]he excited utterance exception is just that—an *exception* to the hearsay rule, and it should not be construed so broadly that it renders the hearsay rule ineffectual." *State v. Branch*, 182 N.J. 338, 865 A.2d 673, 690 (2005) (emphasis in original). "Over the years, some of our cases have imported a measure of flexibility into the admissibility calculus of spontaneous exclamations and excited utterances, but the fundamentals of the doctrine have remained intact." *Odemns v. United States*, 901 A.2d 770, 778 (D.C.2006). On this record, I conclude that Mr. Brown's utterances were neither spontaneous nor excited, and they should have been excluded.

## I. Governing Principles

To satisfy the spontaneous (or excited) utterance exception, the proponent of the evidence must show:

(1) the presence of a serious occurrence which causes a state of nervous excitement or physical shock in the declarant,

---

11. Where a challenge to the sufficiency of the evidence has been preserved, we view the evidence "in the light most favorable to the government, giving full play to the right of the [fact-finder] to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *McCraney v. United States*, 983 A.2d 1041, 1056 (D.C.2009) (quotation marks omitted); *see also In re R.S.*, 6 A.3d 854, 859 (D.C.2010) (same).

(2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances, which in their totality suggest spontaneity and sincerity of the remark.

*In re L.L.*, 974 A.2d 859, 863 (D.C.2009) (quoting *Odemns*, 901 A.2d at 776). All "three factors ... *must* be established before a statement may be admitted" under the exception. *Lewis v. United States*, 938 A.2d 771, 775 (D.C.2007) (emphasis added); *see Simmons v. United States*, 945 A.2d 1183, 1187 (D.C.2008) ("the proponent of evidence offered as an excited utterance *must* show" three factors) (emphasis added).

This hearsay exception is premised on the theory that

under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, ... the utterance may be taken as particularly trustworthy[.]

6 WIGMORE, EVIDENCE § 1747 at 195 (Chadbourn Rev.1976); *Guthrie v. United States*, 92 U.S.App.D.C. 361, 364, 207 F.2d 19, 22 (1953) (same); *Beausoliel v. United States*, 71 App.D.C. 111, 113–14, 107 F.2d 292, 294–95 (1939) (same); *see* 2 MCCORMICK, EVIDENCE § 272 at 255 (6th ed.2006)

("rationale for the exception lies in the special reliability that is furnished when excitement suspends the declarant's powers of reflection and fabrication"); *Odemns*, 901 A.2d at 777 n. 6 (quoting *United States v. Edmonds*, 63 F.Supp. 968, 971 (D.D.C.1946)) (declarations "made while the spell endures are uncontrolled" and are "practically reflex actions"). Accordingly, we have observed that "the earmarks of an excited utterance [are] spontaneity, lack of reflection or forethought, [and] a reflexive response to a traumatic event[.]" *Clarke v. United States*, 943 A.2d 555, 558 (D.C.2008).

## II. Mr. Brown's Statements Were Not Excited Utterances

### A. Lack of Excitement

There is no doubt that this brutal assault was a "serious occurrence." *See generally Lyons v. United States*, 683 A.2d 1080, 1083 (D.C.1996) (collecting cases). But that is not enough; as noted above, the first element of our test for admissibility has two parts. To satisfy this element, there must also be "evidence that the declarant was highly distraught and in shock at the time the statement was uttered...." *Alston v. United States*, 462 A.2d 1122, 1127 (D.C.1983); *accord, (Damon) Smith v. United States*, 26 A.3d 248, 258 (D.C.2011). Here, however, Mr. Brown did not exhibit a "state of nervous excitement as a result of the event." *(Raphael) Smith v. United States*, 666 A.2d 1216, 1222 (D.C.1995).

None of Mr. Brown's neighbors described him as excited, stunned, surprised, or agitated when he said, "Tony." [1] Indeed,

---

1. Cf. *Reyes v. United States*, 933 A.2d 785, 790 (D.C.2007) (declarant, who had escaped a robbery/kidnaping minutes before making challenged statements, was "bleed[ing] profusely" and "very upset, highly agitated, scared" and "was rambling off several things at once in a very agitated tone of voice"); *Price v. United States*, 545 A.2d 1219, 1221 (D.C.1988) ("Sounding as if she was in tears,

although this was probably his first opportunity to tell anyone what happened, Mr. Brown did not blurt out the name "Tony." Instead, Ms. Johnson first asked Mr. Brown, "are you all right? You okay? How are you feeling?" In response, he told her "very plainly" that "I ain't doing so good." [2] Once Ms. Johnson determined that someone had called an ambulance, she told Mr. Brown: "Just keep talking to me," "[e]verything is going to be all right, and the ambulance is on [its] way[.]" Ms. Johnson also asked Mr. Brown, "what happened?" He replied, "I don't know." Then she said, "Who did this to you?" At that point, "he responded with 'Tony.'"

To be sure, our governing case law speaks of "a state of nervous excitement *or* physical shock," and Ms. Johnson, a medical professional, stated that Mr. Brown "looked like he was in shock." However, we have cautioned that the requirements of this hearsay exception "cannot be avoided by rote recitations that the declarant was upset or excited or afraid," *Odemns,* 901 A.2d at 777, and the same may be said about uncritical use of the term "shock." The "medical term 'shock' and the legal concept of an 'excited utterance' are not synonymous. The sheer fact that an individual may medically be in shock when he makes a statement does not demand that his statement be legally recognized as an 'excited utterance.'" *Marquez v. State,* 890 P.2d 980, 984–85 (Okla.Crim.App.1995);

*see also Silver Seal Products Co. v. Owens,* 523 P.2d 1091, 1096 (Okla.1974) (comparing general and medical definitions of shock and concluding that the "imprecise use of the term has brought confusion into our case law concerning *res gestae* statements").

Shock, in the medical sense, means "a sudden disturbance of mental equilibrium" or "a condition of acute peripheral circulatory failure due to derangement of circulatory control or loss of circulating fluid. It is marked by hypotension [decreased blood pressure], coldness of the skin, usually tachycardia [feeble rapid pulse], and often anxiety." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1197 (26th ed.1981). Here, of course, the evidence showed that Mr. Brown had lost a massive amount of blood. Dr. Street, the trauma surgeon at the Washington Hospital Center, testified that Mr. Brown was "in shock, meaning he had low blood pressure"—not that he was shocked in the sense contemplated by the excited utterance exception.

**B. Time to Reflect**

The passage of time is equally, if not more, problematic. This "hearsay exception was ... intended to apply to situations in which the declarant was so excited by the precipitating event that he or she was still 'under the spell of its effect.'" *Odemns,* 901 A.2d at 777 (quoting *Edmonds,* 63 F.Supp. at 971). Thus, while

---

[declarant] blurted out [challenged statement] and kept repeating the words.").

The paramedic's trial testimony that Mr. Brown was "emotional," "in pain," and in "distress" in the ambulance described his mental state *after* he made the statements to his neighbors. Our focus must be on his condition "at the time the statement was uttered[,]" *Alston,* 462 A.2d at 1127, and the best evidence of that is the testimony of his neighbors-particularly Ms. Johnson.

**2.** *Cf. Bryant v. United States,* 859 A.2d 1093, 1100 (D.C.2004) ("As soon as [declarant] made eye contact with [an officer, she] exclaimed that she had been kidnapped and raped. [The officer] described her as 'crying, shaking, [and] very distraught[.]'"); *Lewis,* 938 A.2d at 773–74 (declarant was bleeding from "multiple lacerations" and "excited," "crying," "agitated," and "very, very upset," when officer saw her within minutes of assault; the "first thing she kept [repeating], even before [he] could [ask] if she needed help or not, [was] he was trying to kill me").

"the time element is not controlling, it is of great significance," *Alston,* 462 A.2d at 1127, "because it assures that the declarant has not reflected or premeditated or constructed the statement[.]" *Reyes,* 933 A.2d at 790 (citing *Alston,* 462 A.2d at 1127).[3] As the time interval expands, on the other hand, the opportunity for reflection increases and the likelihood of spontaneity decreases.

Here, the government could not establish that the assault occurred fewer than five hours earlier. Thus, this case is "hardly [one] in which the out-of-court statement was made 'immediately upon the hurt received' " or "so soon after the [serious occurrence] that the victim had no opportunity to reflect." *Odemns,* 901 A.2d at 779 (internal quotation marks and citations omitted).

The majority responds to this problem by positing a different, more recent, startling event—when Mr. Brown was "nudged into consciousness," saw Ms. Johnson staring into his eyes, and heard his neighbors screaming. This reasoning ignores the fact that, to be admissible under the excited utterance exception, the statement must relate to and illuminate the serious occurrence which caused the excitement.[4] Contrary to the majority's suggestion, it is not enough that "a later startling event may trigger associations with an original trauma...." *Ante* at 133

n. 5 (citation omitted). This court has "never held that the declarant's *thinking about* a traumatic event is sufficient to trigger an excited utterance." *In re L.L.,* 974 A.2d at 864 (emphasis in original).

A related, but important, problem is that we have no information about Mr. Brown's mental state from the time of the assault until he made the declarations. We do not know, for example, whether he was unconscious for most of the time, and the government did not present expert testimony about whether such serious injuries would necessarily suspend his capacity for reflection. *See United States v. Kearney,* 136 U.S.App.D.C. 328, 333 n. 11, 420 F.2d 170, 175 n. 11 (1969) ("[W]hat must be taken into account is not only the length of the intervening time period but also an assessment of the declarant's activities and attitudes in the meanwhile...."); 2 McCORMICK, EVIDENCE § 272 at 258 ("[W]here the time interval between the event and the statement is long enough to permit reflective thought, the statement will [generally] be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process.").

### C. Lack of Spontaneity

Finally, the totality of circumstances does not suggest the spontaneity of the remarks.[5] Although the fact that Mr.

3. *See Jones v. United States,* 829 A.2d 464, 469 (D.C.2003) ("[The] hearsay exception for spontaneous exclamations applies where the 'utterance is made under the *immediate* and *uncontrolled* domination of the senses,' " so it "may be taken as particularly trustworthy.") (emphasis added) (quoting *Beausoliel,* 71 App. D.C. at 113–14, 107 F.2d at 294–95); *(Raphael) Smith,* 666 A.2d at 1223 ("The critical factor is that the declaration was made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it.") (citations and internal quotation marks omitted).

4. *See (Raphael) Smith,* 666 A.2d at 1223 (trial court properly admitted statement to 911 operator as an excited utterance after determining that victim's "excited state was caused by the shock of being robbed at gunpoint," rather than by discussing the robbery with his mother, who insisted that he call 911).

5. *Cf. Simmons,* 945 A.2d at 1189–90 ("totality of the circumstances reasonably suggests that the elderly declarant's remarks were 'a spontaneous reaction to the exciting event, rather than the result of reflective thought' " where speaker was "agitated and distressed in the immediate aftermath [about fifteen minutes]

Brown's "statements ... were made in response to inquiry is not decisive, ... that fact is entitled to consideration." *Beausoliel*, 71 App.D.C. at 114, 107 F.2d at 295; *see* 2 McCORMICK, EVIDENCE § 272 at 258 ("Although not grounds for automatic exclusion, evidence that the statement was made in response to an inquiry ... is an indication that [it] was the result of reflective thought. Where the time interval permitted such thought, [these] factors might swing the balance in favor of exclusion."). Moreover, Mr. Brown's response to the question, "who did this to you," came after he answered other questions "very plainly." When we factor into our analysis of the three elements the fact that someone asked about and yelled for "Tony" just before Mr. Brown first uttered that name, the overall "trustworthiness of the utterances was somewhat speculative and marginal, at best." *Alston*, 462 A.2d at 1128 (quotation marks omitted).

The government now claims that "[e]ven if Mr. Brown had been conscious for up to five hours between the assault and his statement," he still "lacked the ability to reflect during the time period, because [he] was undeniably in great pain." This argument is based upon a crucial, but untested, assumption-that pain necessarily deprived Mr. Brown of "the ability to reflect during the time period...." I believe this is a matter to be established, not merely assumed.

Some of our precedents have emphasized that the victim was suffering from great pain at the time of the utterance, but they have treated pain as part of the totality of the circumstances, not as a substitute for more comprehensive analysis. In other words, there is no blanket rule for dealing with pain in this context. In some cases involving "external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control...." *Beausoliel*, 71 App.D.C. at 113, 107 F.2d at 294. On other occasions, grave and painful injuries may be severely debilitating and have a dulling effect upon the mind.

Two cases involving pain appear to help the government. In *Harris v. United States*, 373 A.2d 590, 593 (D.C.1977), we upheld the admission of a statement made in the emergency room approximately two hours after a shooting, emphasizing that "there was testimony that [the declarant] was in a great deal of pain, and that it was an effort for him to talk." We held that the trial court had not erred in concluding that the victim "was substantially and predominantly under the influence of the trauma ..." when he spoke. *Id.*

Because of the brevity of discussion in *Harris*, it is difficult to meaningfully compare that case to ours. Among other things, the court thought it important that there "was little time or opportunity" for the declarant to reflect, as the police arrived "shortly [ ]after" the attack and the victim made the remarks within two hours. We concluded, in light of the circumstances, "that his statement was spontaneous." 373 A.2d at 591, 593. The court also emphasized that the declarant "was supplying raw data for analysis rather than giving any conclusions or pointing a finger at any particular individual[,]" which helped "insure the reliability of the admitted statements." *Id.* at 593 & n. 9 (citing *Kearney*, 136 U.S.App.D.C. at 333, 420 F.2d at 175). Mr. Brown's statements, by contrast, have been treated as an accusation.

of a shocking and frightening shooting, and he blurted out his concerns before the commotion subsided to a total stranger who had only asked him if he was 'okay' ") (quoting *Randolph v. United States*, 882 A.2d 210, 217 (D.C.2005)).

In *Guthrie,* 92 U.S.App.D.C. at 363–65, 207 F.2d at 21–23, the victim's statement was admitted although as many as eleven hours may have passed after the initial assault. In that case, the court focused on whether the statement "was made during a period of *nervous stress and shock* caused by physical violence. . . ." *Id.* at 364, 207 F.2d at 22 (emphasis added). There was testimony that the victim was at times incoherent and "in a dazed or semi-conscious condition" and "appeared to be in great pain[.]" *Id.* at 365, 207 F.2d at 23. The victim herself "said she was in terrific pain and screamed as she was carried to an ambulance." *Id.* at 363, 207 F.2d at 21.

Another case involving pain provides an instructive contrast to the present record. In *United States v. Glenn,* 154 U.S.App. D.C. 61, 63–65, 473 F.2d 191, 193–95 (1972), the declarant, who "made her statement only minutes after she was fatally stabbed[,]" was "moan[ing] or groan[ing] as though she were in pain[,]" "gasping for breath, and about to lapse into unconsciousness. . . ." She "appeared as though she was trying to scream but could not get enough breath[,]" and repeated, "Help me. Help me. He did it." *Id.* Another witness stated the declarant "was excited, appeared to be looking for help, and was gasping for breath." *Id.* A doctor testified about when the stabbing probably occurred and "concluded that [she] was in pain from her wounds[.]" *Id.* The circuit

court decided that "[h]er situation was not conducive to detached reflection and deliberation; on the contrary the only reasonable conclusion from the uncontradicted proof is that when she spoke she was in the grip of high excitement." *Id.* at 65, 473 F.2d at 195.[6]

Here, neither Mr. Brown's actions, nor his words, nor his tone of voice exhibited the stress of nervous excitement. There was ample time for reflection and no expert testified that Mr. Brown's injuries caused a level of pain that precluded deliberation.[7] The statement did not escape his lips as soon as he saw his neighbors. Nor was it even volunteered.

In sum, the trial court erred in admitting the statements as excited utterances. Because the decedent's statements "were the only direct evidence presented which identified appellant as the assailant, we cannot say that the admission [of these utterances] did not substantially sway the judgment of the jury in its deliberations." *Alston,* 462 A.2d at 1129 (citing *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). I respectfully dissent.

---

**6.** Although there are additional ways of distinguishing our current case from *Harris, Guthrie,* and *Glenn,* I make no claim that all of our case law can be neatly harmonized.

**7.** *See State v. Ruelas,* 174 Ariz. 37, 846 P.2d 850, 852, 854–55 (App.1992) (victim's statement, made an hour and a half after fatal stabbing was not admissible where victim was "alert and awake, but appeared to be in considerable pain" and "was having some trouble breathing"; "There was no other evidence offered to show the mental state of the victim. Nothing in the record indicates that the victim was nervous, excited, or in shock.").