**Lindo Omar CASTILLO, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 12–CM–161.**

District of Columbia Court of Appeals.

Submitted June 26, 2013.
Decided Aug. 29, 2013.

James Klein, Alice Wang, Fleming Terrell, and Jonathan W. Anderson, Public Defender Service, were on the brief for appellant.

Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman, Eric Zwicker and Kristina L. Ament, Assistant United States Attorneys, were on the brief for appellee.

1. D.C.Code § 22–3010.01 (Supp.2007).

Before GLICKMAN and OBERLY, Associate Judges, and NEWMAN, Senior Judge.

OBERLY, Associate Judge:

Appellant Lindo Omar Castillo was convicted of misdemeanor sexual abuse of a minor when he touched the breast of his fourteen-year-old stepdaughter, E.M.[1] On appeal, appellant contends that the trial court committed reversible error by admitting the statements of E.M. and her brother under the spontaneous utterance exception to the hearsay rule. We agree and reverse.

## I. Background

At two o'clock in the morning on December 25, 2010, Francisco Martinez called 911 to report that he had witnessed "something inappropriate" between appellant and Martinez's fourteen-year-old sister, E.M. Sometime after the call, police responded to E.M.'s home at 1021 Lamont Street, Northwest, Washington, D.C., where she resided with her mother and appellant. Crying and appearing "hysterical" and "upset," E.M. told Officers Diane Durham and Jose Gonzalez that her stepfather had grabbed her breast. Martinez also reported to Officer Gonzalez that he had observed appellant touch his sister's breast. At trial, however, both siblings testified that they recollected little from the December 25th incident, claiming to have been intoxicated.

The evidence against appellant consisted exclusively of three accusations admitted into evidence under the spontaneous utterance exception to the hearsay rule: (1) E.M.'s report to Officer Durham; (2) E.M.'s report to Officer Gonzalez; and (3) Martinez's report to Officer Gonzalez.

## A. Officer Durham's Testimony

Officer Durham testified that she had been working a shift that started at 9 p.m. on December 24, 2010, and ended at 6 a.m. the following morning. Although she could not remember what time she arrived at E.M.'s residence, she testified that she responded within two minutes of receiving "a run from the dispatcher." According to Officer Durham, Martinez was "calm [and] normal" when she arrived at the house. E.M., however, "was very upset. She was crying. She was hysterical."

At this point, the government sought to introduce E.M.'s hearsay statements by probing, "what did [E.M.] tell you?" In response to appellant's objection, the government argued that "this is clearly an excited utterance.... [because Officer Durham] stated [that E.M.] was hysterical. [Officer Durham] arrived within minutes of the [dispatch]." The trial court sustained appellant's objection because "[t]here has to be some temporal relationship between the state of excitement" and the alleged incident.

Officer Durham could not testify to an "exact time that [the incident] happened because [E.M.] didn't give me the exact time." To narrow down a time frame, the government asked Officer Durham whether she "learn[ed] from the complainant what day the alleged incident took place." Officer Durham responded that it had happened on the night she "received ... the assignment, the 25th." The government again sought to introduce E.M.'s statements, but appellant objected and argued that the temporal connection remained unsatisfied: "[A]ll we know now is ... [that] according to the witness[,] there was an incident. And at the time the police officer arrived, sometime thereafter, the witness was upset and hysterical." Appellant added, "there is no evidence that ... her hysteria is a result of this incident." Shift-ing its focus from whether there was a temporal connection between the event and E.M.'s statement to whether there was a causal connection, the trial court then instructed the government, "[t]hat [is] the link you need to make."

To establish the causal link, the government elicited from Officer Durham that "[E.M.] was upset because she had a[n] incident that happened with her stepfather[,] the same incident that [Officer Durham] respond[ed] to the call for." Appellant objected that Officer Durham was speculating, and the trial court decided to "provisionally hear more detail" and allow the government to lay a foundation. As permitted by this ruling, the prosecutor then asked Officer Durham what E.M. said while she was "hysterical," and Officer Durham replied, "[E.M.] stated to me that she was in the kitchen and her stepfather grabbed her breasts. Her brother saw it. And the stepfather ran out the rear door of the kitchen. And she continued to cry, and speak a little Spanish, and I just continued to try to calm her down [un]til[ ] we could get some translators." The trial court overruled appellant's objection and received E.M.'s report to Officer Durham as a spontaneous utterance.

## B. Officer Gonzalez's testimony

Officer Gonzalez also testified as the government's witness. During his 9 p.m. to 6 a.m. shift, Officer Gonzalez reported to E.M.'s residence because he "was the only Spanish-speaking officer in the 3rd District" and was needed as a translator. Officer Gonzalez could not specify when he arrived at the house, except to note that it was before the arrival of another officer (not Officer Durham) who had responded to the scene.

### 1. E.M.'s report to Officer Gonzalez

When Officer Gonzalez arrived at the house, he first spoke with E.M.'s mother

and then spoke with E.M. sometime in the "early morning ... hours. I don't remember exactly what time it was." He remained in the house "for about a good several hours." On direct examination, Officer Gonzalez testified that "[E.M.] was hysterical at the time inside the house. She was really upset and crying. And she was basically telling me[,] Gonzalez, Gonzalez, I can't believe this is happening to me." [2] Officer Gonzalez then told her to calm down. When asked if E.M. explained why she was upset, Officer Gonzalez responded, "[S]he was upset because ... her stepfather had touched her breast."

On cross-examination, defense counsel elicited from Officer Gonzalez that E.M. reported the touching only *after* she had calmed down. "Before [Officer Gonzalez] had a conversation with [E.M.] about the details" of what happened, he "calmed her down." Although E.M. continued to cry, "she was actually calmed down" at the time she reported appellant's conduct to Officer Gonzalez. On redirect, however, Officer Gonzalez explained that when E.M. told him "I can[not] believe this is happening to me," he said, "calm down, what happened?" "Right at that time," E.M. told Officer Gonzalez that "her stepfather had touched her breast." According to Officer Gonzalez, these statements were made in one uninterrupted conversation.

### 2. Martinez's report to Officer Gonzalez

On direct examination, Officer Gonzalez also described his interaction with Martinez. When asked how Martinez had appeared, Officer Gonzalez stated: "[Martinez] was really upset. When I first got on the scene, he was constantly ... moving side by side inside the house...."

[Martinez] told [another] officer that he broke the window because he was upset about what he observed in the kitchen." The government then sought to elicit from Officer Gonzalez statements that Martinez had made about what he had observed. Over objection, the trial court allowed Officer Gonzalez to respond that Martinez had "stated that he observed his stepfather touch his sister's breast in the kitchen and that's why he was upset."

On cross-examination, Officer Gonzalez testified that "at the time ... I told [Martinez] to calm down and even though he was upset ... he calmed down." Martinez remained crying, but "he was [not] screaming like he was when [Gonzalez] first came into the house." Officer Gonzalez further acknowledged that Martinez "was able to calmly tell [Gonzalez] what happened." On redirect, Officer Gonzalez testified that Martinez made the statement about ten minutes after pacing around and screaming and that Martinez "was screaming ... to everyone that ... he was upset because he observed ... his stepfather touch[ing] his sister's breast."

### C. The Trial Court's Findings and Ruling

The trial court credited both Officer Durham's testimony and Officer Gonzalez's testimony. Addressing the discrepancy between Officer Durham's account of Martinez's demeanor—he was "calm"—and Officer Gonzalez's account—he was "really upset"—the trial court did not doubt its ability to credit Officer Durham because "we don't know when she got there" and whether it was before or after Officer Gonzalez. The trial court reaffirmed its earlier ruling receiving E.M.'s statement to Officer Durham as an excited utterance.

**2.** Gonzalez had known E.M. and her mother casually because he had a part-time job at a nearby supermarket.

The trial court likewise concluded that Officer Gonzalez was a credible witness, finding his testimony on direct examination, cross-examination, and redirect examination to "coexist with each other." The trial court reconciled the differences in Officer Gonzalez's testimony on cross-examination and on redirect, finding that (1) his testimony "in its entirety" was consistent, and (2) "in the context of those fast-moving events ... references to people being calm on cross-examination were kind of relative statements," and Officer Gonzalez likely meant "somewhat calmed down." Finding that his description of the "emotional state" of E.M. and Martinez satisfied the spontaneous utterance criteria, the trial court concluded that "at the time when they fit the hearsay exception of the spontaneous utterance, both the brother and the complainant reported that the stepfather grabbed the child's breast." The trial court made no findings on the temporal nexus between the alleged event and the various statements.

In total, the trial court admitted three statements as excited utterances: (1) E.M.'s report to Officer Durham, "the essence of the words, 'He grabbed my breast and he left afterwards,' " (2) E.M.'s report to Officer Gonzalez "that the stepfather grabbed the child's breast," and (3) Martinez's report to Officer Gonzalez "that the stepfather grabbed the child's breast." Relying on these statements, the trial court found appellant guilty of the charge beyond a reasonable doubt. Appellant timely appealed.

## II. Analysis

Appellant contends that the trial court incorrectly admitted E.M.'s and Martinez's out-of-court statements as spontaneous utterances because the government adduced insufficient evidence to show that (1) the siblings were "in the state of nervous excitement necessary for a spontaneous utterance"; and (2) their declarations were made "within a short enough time of the alleged touching to preclude reflection."

■■■ " 'Because the decision whether a statement is admissible as a spontaneous utterance depends on the particular facts of each case and is thus a discretionary matter,' " we review such a decision for an abuse of discretion. *In re L.L.,* 974 A.2d 859, 862 (D.C.2009) (quoting *Brisbon v. United States,* 894 A.2d 1121, 1128 (D.C. 2006)). The underlying factual findings supporting "the decision whether to admit or exclude the proffered statement" are reviewed under the clearly erroneous standard. *Odemns v. United States,* 901 A.2d 770, 776 (D.C.2006). A trial court has the legal responsibility "to examine the testimony and determine whether the proper foundation has been laid for the exercise of discretion as to its admission." *Id.* at 775–76 (internal quotation marks omitted). Therefore, a trial court abuses its discretion when "it rests its conclusions on incorrect legal standards" or "the stated reasons do not rest upon a sufficient factual predicate." *In re J.D.C.,* 594 A.2d 70, 75 (D.C.1991) (alteration and internal quotation marks omitted).

### A. The Hearsay Exception for Excited Utterances

■■■ If a party seeks to admit an out-of-court statement under the excited utterance exception to the hearsay rule, the statement must be "a spontaneous declaration, not only tending to explain the act or occurrence with which it is connected but also indicating a spontaneous utterance of a thought while under the influence of that act or occurrence, with no opportunity for premeditation or deliberation." *Brown v. United States,* 27 A.3d 127, 131 (D.C.2011) (internal quotation marks omitted). For a

hearsay statement to be admitted as an excited utterance, there must be:

> (1) the presence of a serious occurrence which causes a state of nervous excitement *or* physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances, which in their totality suggest spontaneity and sincerity of the remark.

*Id.* (internal quotation marks omitted).

■ The rationale underlying the exception is that the "utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection," and thus the utterance is considered "particularly trustworthy." *Odemns*, 901 A.2d at 778 (emphasis and internal quotation marks omitted). Accordingly, in order "to protect litigants from judgments based on unreliable second-hand evidence which is not subject to cross-examination," it is important "that the declaration was made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon her statement or premeditated or constructed it." *Id.* at 777 (alterations, emphasis, and internal quotation marks omitted). "[S]pontaneity and lack of opportunity for reflection constitute the key elements," and "rote recitations that the declarant

was upset or excited or afraid" as a result of a startling event will not, by themselves, meet the requirements of an excited utterance. *Id.*

■ In this case, the alleged sexual assault—and witnessing such an assault—certainly could be serious enough to cause a state of nervous excitement in the siblings. *See Williams v. United States*, 859 A.2d 130, 140 (D.C.2004) ("There can be no doubt that a sexual assault qualifies as [a] serious occurrence."). And we are willing to assume, based on the testimony that the trial court credited, that E.M. was in a state of nervous excitement caused by the alleged groping when she made the statements to Officers Durham and Gonzalez.[3] *See Smith v. United States*, 666 A.2d 1216, 1222 (D.C.1995) ("If the evidence suggests that the declarant was highly distraught and in shock at the time the statement was uttered, the requisite element that the declarant be in a state of nervous excitement is satisfied.") (alteration and internal quotation marks omitted). What is missing from the record, however, is evidence that E.M. and Martinez made their statements within a "reasonably short period of time after the occurrence so as to assure that [they] ha[d] not reflected upon [their] statement[s] or premeditated or constructed [them]." *Brown*, 27 A.3d at 131 (internal quotation marks omitted).

■ The trial court was aware that a "temporal relationship" between the event and the statement was necessary, initially sustaining appellant's objection because

---

**3.** The trial court's ability to reconcile Officer Gonzalez's potentially inconsistent testimony by concluding that he likely meant "somewhat calmed down" when referring to E.M.'s and Martinez's emotional states does not strike us as clearly erroneous. As the trial court reasoned, "in the context of those fast-moving events ... references to people being calm on cross-examination were kind of rela-

tive statements." For reasons explained later, we are not convinced that, when he spoke to Officer Gonzalez, Martinez was "under the fresh emotional impact of a startling event" as opposed to reflecting upon what he had seen earlier. *In re L.L.*, 974 A.2d 859, 864 (D.C.2009) (internal quotation marks omitted).

the government had shown only that E.M. was hysterical: "[I]f [it] is [the government's] contention that time does [not] matter, [then] I sustain the objection." For whatever reason, the court retreated from this position, ultimately satisfied that the government had established a *causal* connection between E.M.'s hysteria and her statements. The record in this case, however, makes it impossible to discern the *temporal* relationship between the groping and E.M.'s and Martinez's statements to the police and therefore does not permit the conclusion that the statements were made spontaneously and without reflection.

▆▆▆ "While the time element is not controlling, *it is of great significance.*" *Odemns,* 901 A.2d at 778 (internal quotation marks omitted). And although there is no "inflexible rule as to the length of interval" between the event and the utterance, *Brown,* 27 A.3d at 133 (internal quotation marks omitted), there must be some evidence from which a finder of fact can reasonably infer that the statement was made within a reasonably short period of time after the startling event. The evidence may be circumstantial, rather than direct. *See id.* (inferring reasonable time because the carpet squished with blood and the victim did not bleed out despite his gaping wounds); *Lewis v. United States,* 938 A.2d 771, 774–75, 782 (D.C.2007) (inferring reasonable period of time because victim was bleeding and police responded to the scene within minutes after receiving a radio run).

Neither Officer Durham nor Officer Gonzalez knew when the alleged groping had occurred. Officer Durham stated that it happened on the night she "received ... the assignment, the 25th," but she was unable to further specify the timing. Though we do not mean to diminish the seriousness of the alleged incident, it was relatively minor compared with, for example, a gunshot wound, and thus we would be speculating if we inferred that it occurred close to the time Martinez called 911 at 2 a.m.[4] Based on Officer Durham's testimony and the timing of the 911 call, we are left with a reasonable inference that the assault occurred sometime between 12 a.m. and 2 a.m. E.M.'s and Martinez's statements were made sometime after that, when Officers Durham and Gonzalez arrived on the scene. Only Officer Durham gave an estimate of when she arrived—within a few minutes of receiving the radio run—while Officer Gonzalez did not know when he arrived. Both Officers Durham and Gonzalez testified that other officers were already on the scene when they each arrived. Officer Durham did not specify when, after she arrived, she spoke with E.M., stating only that she had had an "opportunity to speak with her." Officer Gonzalez testified that he first spoke with E.M.'s mother and then spoke with E.M. sometime in the "early morning ... hours."

Here, we have a two-hour time span, *at least,* in which the event could have occurred and the statements could have been made, leaving plenty of time for reflection. Although E.M. was apparently "crying" and "hysterical" both when Officer Durham spoke with her and when Officer Gonzalez spoke with her, she could just as likely have "become distraught by reliving a traumatic experience," and that would mean "she ha[d] reflected on the event" and "revived bad memories," *L.L.,* 974 A.2d at 864 (internal quotation marks omitted), not that she was still "under the

---

**4.** In fact, Martinez did not call 911 from E.M.'s house, where the incident occurred, which tells us that the 911 call could not have been made immediately after Martinez observed the incident.

spell" of the event. *Odemns*, 901 A.2d at 779 (internal quotation marks omitted).

Rarely, if ever, have we upheld the admission of statements made more than one hour after the alleged incident, unless the declarant was a young child, *see Odemns*, 901 A.2d at 778–79 ("Statements made one hour after the incident, on the other hand, are admitted when, and presumably only when, 'the age and condition of the declarant support spontaneity.'") (quoting *Alston v. United States*, 462 A.2d 1122, 1127 (D.C.1983)); *Williams*, 859 A.2d at 140 (upholding admission of five-year-old's statement made "within a few hours" of being sexually abused), or the incident was especially serious, *see Harris v. United States*, 373 A.2d 590, 593 (D.C.1977) (upholding admission of dying man's statements made two hours after the shooting because he was "suffering from several gun shot wounds ... his blood pressure was zero ... he was in a great deal of pain, and ... it was an effort for him to talk").

▆▆▆ The uncertainty of timing is particularly important to the excited utterance inquiry in this case because the triggering event was a relatively minor assault. The seriousness of the startling event is relevant to the determination of whether the utterance occurred within a reasonably short period of time such that it was made spontaneously and without reflection. *See Odemns*, 901 A.2d at 781 (distinguishing *Harris*, 373 A.2d at 593, a case with "extraordinary circumstances" surrounding the admission of statements made two hours after the declarant had suffered multiple serious gunshot wounds); *Brown*, 27 A.3d at 134 ("[T]he evidence supports an inference that his utterances when his neighbors found him barely conscious would not likely have resulted from deliberation."). An inappropriate sexual touching, while serious, is less traumatic than

rape, gunshot wounds, threats of violence, or some other violent victimization, in which the declarant may be "under the influence of the startling event" for a longer period of time. *Lewis*, 938 A.2d at 775. Cases in which we have upheld the admission of hearsay statements under the excited utterance exception where no particular time frame had been established involved arguably more serious victimizations than the groping at issue here and, in many cases, included circumstantial evidence of the lapse of a reasonably short period of time. *See Brown*, 27 A.3d at 133 (declarant was shot and reasonable inference that "attack occurred closer to 5 p.m. (the time when Brown was found) than to noon" because "carpet squished with blood" and "Brown had not bled out despite his gaping wounds"); *Simmons v. United States*, 945 A.2d 1183, 1189 (D.C.2008) (declarant was shot and reasonable inference that "not many minutes had elapsed, because the shooting evidently occurred while [the witness] was inside the McDonald's restaurant for approximately fifteen minutes, and she met the declarant very soon after she left"); *Lewis*, 938 A.2d at 773, 782 (declarant was violently assaulted and "was bleeding from the head and face area" when the officer arrived within a few minutes of receiving the radio run).

In *Odemns*, we held that the admission of hearsay statements under the excited utterance exception was error where declarant "was subjected to a frightening armed robbery" because the statements were made "an hour before she was interviewed" and not "immediately upon the hurt received." *Odemns*, 901 A.2d at 775 (internal quotation marks omitted). Moreover, we held, the adjectives used to describe the declarant's state of mind—"upset," "excited," "shaken," "afraid"—"do not establish, or even significantly address, the element of spontaneity on which the theo-

ry of this hearsay exception is based." *Id.* at 781. If statements by an "upset," "excited," "shaken," and "afraid" declarant made an hour after a frightening armed robbery do not meet the requirements of an excited utterance, we have trouble reaching the opposite conclusion with statements by an "upset" and "hysterical" declarant made as many as two or more hours after her stepfather grabbed her breast.

 We are even less convinced that Martinez's statement to Officer Gonzalez constituted an excited utterance. On the 911 call, Martinez sounded calm, explaining the incident coherently and clearly and deliberately answering the operator's questions.[5] When Officer Gonzalez saw him later after responding to the call and he appeared angry and screaming, it is more likely that he "became upset when [he] reflected on what [appellant] had done to [his sister]" and thus was not "under the fresh emotional impact of a startling event." *In re L.L.*, 974 A.2d at 863 (internal quotation marks omitted). The discrepancy between Officer Durham's and Officer Gonzalez's description of Martinez supports the conclusion that "several peaceful" moments passed between the event and his statements to Officer Gonzalez. *Id.*

The trial court no doubt thought carefully before admitting each statement as an excited utterance; indeed, a substantial portion of the trial was devoted to bench conferences discussing the admissibility of the statements. Nonetheless, the trial court's "stated reasons" for admitting the statements "do not rest upon a sufficient factual predicate," and it was error to admit them. *In re J.D.C.*, 594 A.2d at 75.

**B. Harmless Error Analysis**

 Because the government cannot show that it is "highly probable" that the erroneously admitted statements did not contribute to the verdict, the trial court's error was not harmless. *Odemns*, 901 A.2d at 782. To conclude that an error is harmless, it must be " 'so inconsequential that it made no appreciable difference to the outcome.' " *Id.* (quoting *In re Ty.B.*, 878 A.2d 1255, 1267 (D.C.2005)). The government's evidence against appellant consisted entirely of the three statements admitted as excited utterances. This is hardly a case where the error was "so inconsequential that it made no appreciable difference to the outcome."

For the foregoing reasons, the judgment of the Superior Court is

*Reversed.*

---

**5.** Although the 911 recording was admitted for impeachment purposes only, "a trial court may rely on trustworthy hearsay in ruling on questions of admissibility." *Roberson v. United States*, 961 A.2d 1092, 1096 & n. 11 (D.C. 2008) (applying Federal Rule of Evidence 104(a)); *see also United States v. Woodfolk*, 656 A.2d 1145, 1151 n. 16 (D.C.1995) ("The trial court was entitled to consider the declarant's tone and tenor of voice on the [911] tape recording in determining the issue of excited utterance.").